**In the Matter of the ADOPTION OF A.M.B., A Minor Child.**

**R.A.K., Petitioner and Appellee,**

**v.**

**M.E.Z., Respondent and Appellant,**

**and**

**Henry C. Wessman as Executive Director of the North Dakota Department of Human Services, Respondent.**

Civ. No. 930269.

Supreme Court of North Dakota.

March 30, 1994.

Richard J. Linnerooth, Fargo, for petitioner and appellee.

Erik R. Johnson, Solberg, Stewart, Miller & Johnson, Fargo, for respondent and appellant.

Appearance by M.E.Z.

VANDE WALLE, Chief Justice.

Mike (a pseudonym), the natural father to A.M.B., appealed a district court's final decree of adoption of A.M.B. by A.M.B.'s stepfather, Ronald (a pseudonym), upon a finding that Mike's consent to the adoption was not required. We affirm.

Mike and Kim (a pseudonym) had a sexual relationship from October 1989 to July 1990, during which time A.M.B. was conceived. Both resided in the Minneapolis, Minnesota, metropolitan area. Mike and Kim saw each other frequently throughout Kim's pregnancy, and Mike attended and shared in half the expense of Kim's Lamaze classes.

Shortly before A.M.B.'s birth, Kim's feelings for Mike appear to have soured. Kim asked a friend to serve as her Lamaze coach. When A.M.B. was born, Kim refused Mike's request that the child be given his surname. Mike visited Kim and A.M.B. in the hospital, and he brought gifts. However, when Mike visited the hospital on the day Kim was scheduled to leave, Kim and A.M.B. had already departed. Mike immediately drove to Kim's apartment, but was told by Kim's mother that he was not welcome. A few days later, Kim permitted Mike and his mother to visit A.M.B. at Kim's residence, although they were required to remain on the porch and were not invited inside the apartment.

Five days after A.M.B.'s birth, Kim moved to Fargo, North Dakota, to live with her mother. Kim explained to Mike that she wanted her mother's assistance with the child. Mike called Kim once or twice a week for a time following the move, but purports to have been financially unable to visit Kim and A.M.B. in Fargo. After one month in Fargo, Kim began to express irritation with Mike's calls and asked Mike to stop harassing her. After approximately two months, Kim told Mike that he was not the father of the child and that he should stop calling.

Kim attended classes at North Dakota State University, and she and A.M.B. moved from her mother's residence to an apartment closer to campus. Kim did not list the phone number to her apartment in the local phone directory, but the number was listed in the university's student directory. Mike, discouraged by his inability to contact Kim and by Kim's coldness toward him, had virtually no contact with Kim and A.M.B. by the time A.M.B. was four months old.

In July 1991, on A.M.B.'s first birthday, Mike made an unannounced visit, his first since Kim had moved to Fargo. He was received coolly. Mike spent approximately an hour and one-half with Kim and approximately fifteen minutes with A.M.B. Mike gave A.M.B. a stuffed animal and left with Kim a duplicate set of pictures he had taken at the hospital during A.M.B.'s first days. Shortly after Mike's visit, Kim returned the pictures to Mike and reported that the stuffed animal had been thrown away.

By letter dated July 22, 1991, Kim informed Mike that "some type of visitation" with A.M.B. could be arranged, but that "I do not want to talk about other matters and I will not deal with you if it approaches harassment...." Kim also informed Mike that a paternity and support action soon would be brought against him by the State. Mike did not respond to the letter.

Two months later, the paternity action was commenced against Mike. Upon advice of counsel, Mike denied paternity. In December 1991, blood tests indicated a 99.4 percent

probability that Mike was the father of A.M.B. Mike continued to deny paternity and demanded a trial by jury. The court directed Mike to make monthly child support payments into an escrow account, pending a final determination of paternity. Mike made the ordered payments.

While the paternity action was still pending, Mike attempted to visit A.M.B. on A.M.B.'s second birthday, in July 1992. Unable to locate Kim or the child, Mike left a present for A.M.B. with Kim's brother.

On December 15, 1992, Kim married Ronald, who immediately signed a petition for adoption. Upon Kim's request, the State moved to dismiss the paternity action against Mike, who continued to deny paternity. Mike resisted the motion to dismiss the paternity action. Nonetheless, the motion was granted and the paternity action dismissed, and the money Mike had paid into the escrow account, totalling nearly $1,500, was returned to him. Mike used the money to secure an attorney to challenge Ronald's petition to adopt A.M.B.

On May 13, 1993, following a hearing, the district court granted Ronald's petition for adoption. The court concluded that, although Mike did not consent to the adoption, his consent was not required because he had abandoned the child. NDCC § 14–15–06(1)(a). Mike appealed, contending that there was insufficient evidence to conclude that he had abandoned A.M.B. On de novo review, but with appreciable weight given to the trial court's findings, *In Interest of C.K.H.*, 458 N.W.2d 303 (N.D.1990), we affirm.

■ Generally, parental consent is a prerequisite to adoption. NDCC § 14–15–05. One statutory exception to this general rule is created by section 14–15–06(1)(a), NDCC, which negates the need for parental consent to adoption when the parent has abandoned the child. The legislature has not defined abandonment, and we have recognized that "[t]here is no single accepted definition of what to 'abandon' means." *Pritchett v. Executive Dir. of Soc. Serv. Bd.*, 325 N.W.2d 217, 221 (N.D.1982). Abandonment is a question of fact which must be established by clear and convincing evidence. *Id.*

In determining whether abandonment has taken place, we look to such factors as the parent's contact and communication with the child, the parent's love, care and affection toward the child, and the parent's intent. *Id.* Also relevant is the parent's acceptance of parental obligations, such as "to care for, protect, support, educate, give moral guidance to, and provide a home for the child." *Id.* at 221. "A parent's negligent failure to perform his parental duties is significant to the issue of abandonment." *Id.*

■ We note that an unwed father may possess a relationship with his child that is entitled to constitutional protection. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *see generally, Abernathy v. Baby Boy*, 437 S.E.2d 25 (S.C.1993). The extent of this constitutional protection is dependent, in part, on the strength of the relationship; "parental rights do not spring fullblown from the biological connection between parent and child. They require relationships more enduring." *Lehr v. Robertson*, 463 U.S. 248, 260, 103 S.Ct. 2985, 2992, 77 L.Ed.2d 614, 626 (1983) [quoting *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) ].

■ Due Process protection extends to the interest of the biological father in developing a relationship with his child. *Id.* However, this interest "is of limited duration as a constitutionally significant interest because of the child's need for early permanence and stability in parental relationships." *Abernathy, supra*, at 28 [citing Elizabeth Buchanan, *The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson*, 45 Ohio State L.J. 313 (1984) ].

■ The issue on this appeal is factual, i.e., whether Mike has abandoned A.M.B., and is not constitutional, e.g., whether the adoption of A.M.B. by Ronald violated Mike's due process rights. While we remain mindful of Mike's protected interests in this matter, we nonetheless believe that, "[w]hile the ties of a natural parent are not to be treated lightly in adoption proceedings, neither should noncustodial parents treat lightly their rights and responsibilities toward their

minor children." *In re Guardianship of T.C.W.*, 235 Neb. 716, 457 N.W.2d 282, 285 (1990).

Mike contends that he has never intended to abandon A.M.B. As our factual summary indicates, Mike did attempt to assist Kim in her pregnancy and to assume his role as father to the child in the early days of A.M.B.'s life. It also appears that Mike expressed concern for the well-being of Kim and the child, and that he requested permission to visit A.M.B. during the first few months of A.M.B.'s life. Mike asserts that, thereafter, Kim has placed him in a "Catch–22" situation, *see In re Adoption of Klonowski*, 87 Ohio App.3d 352, 622 N.E.2d 376 (5th 1993): she has avoided him and has demanded that he cease contact with her and the child, but now claims that his lack of contact constitutes abandonment.

Mike also claims that, although he did not pay to support A.M.B. prior to the paternity action, he was not asked by Kim to do so, and there had been no court order compelling him to pay. Mike emphasizes that he did pay support into the escrow account when ordered to do so, and that, although the money has not been received by A.M.B., the money is being used indirectly for the benefit of the child, by way of his effort to contest the adoption.

Finally, Mike claims that, during the paternity action, he denied paternity only because his former counsel advised him to do so. Mike claims the attorney informed him that the only certain means of protecting his parental rights, including visitation rights, would be to deny paternity, take the blood tests, and to fully adjudicate his paternity at a trial. Mike emphasizes that he resisted the State's subsequent motion to dismiss the paternity action.

We have considered Mike's explanations for his actions but find that, from a few months after A.M.B.'s birth in July 1990 until the time of Ronald's motion for adoption in December 1992, there has been an absence of contact and communication with A.M.B., an absence of love, care and affection for the child, and a failure to support and to otherwise perform parental duties. Giving appreciable weight to the findings of the district court, we conclude the evidence is clear and convincing that Mike has abandoned A.M.B.

We agree that the fact Kim shielded herself and the baby from Mike is of substantial significance. *See, e.g., Abernathy, supra; Klonowski, supra; Hairston v. Threets,* 105 Or.App. 350, 804 P.2d 1213 (1991). Mike testified that during attempted phone conversations with Kim shortly after Kim had moved to Fargo, Kim had told him to stop harassing her. Kim did not keep Mike apprised of her new address and her unlisted phone number when she moved from her mother's residence. Kim's letter to Mike, written shortly after A.M.B.'s first birthday and stating that visitation could be arranged, also admonished Mike about harassment. Standing alone, we might be inclined to believe that Mike's lack of contact with A.M.B. was sufficiently understandable, if not justifiable, to conclude that the evidence is not clear and convincing that Mike abandoned A.M.B.

■ But this factor does not stand alone. Kim did not prohibit Mike from seeing A.M.B. when Mike visited on the baby's first birthday; Mike spent only fifteen minutes with the child. Mike did not pursue Kim's subsequent offer to arrange visitation. Mike attempted to visit the child on only one other occasion, on the child's second birthday. Mike brought no action to establish his paternity; rather, he denied paternity in all legal contexts until December 1992, when Ronald petitioned for adoption of the child. Because of the importance of a relationship with both parents, we have indicated in custody cases that the fact the custodial parent continually frustrates court-ordered visitation may be a basis for a change in custody. *Blotske v. Leidholm*, 487 N.W.2d 607, 611 (N.D.1992) [VandeWalle, J., concurring specially]. However, just as "frustration of visitation does not alone constitute a sufficient change in circumstances to warrant a change in custody," *Blotske, supra*, at 610, it does not alone excuse the noncustodial parent from efforts to build a relationship with the child.

■ Mike did not pay child support until ordered by the court; we do not believe the

**674**

absence of a court order absolves a parent of his parental duties. *See Matter of Adoption of D.J.V.*, 244 Mont. 209, 796 P.2d 1076 (1990). A.M.B. has received no financial support from Mike. From August 1990 until December 1992, Mike has been with his child once, for fifteen minutes, and has attempted to see the child only twice. Whether or not Mike can blame his former attorney for instructing him to deny paternity is of no comfort to A.M.B. Mike concedes that A.M.B. would not know him as his father. The blame does not rest solely upon Kim or upon Mike's former attorney. Under section 14–15–06(1)(a), NDCC, Mike's consent to the adoption of A.M.B. is not required.

The final decree of adoption is affirmed.

SANDSTROM, NEUMANN, LEVINE and MESCHKE, JJ., concur.