529 N.W.2d 864 (1995)
In the Matter of the ADOPTION OF A.M.M., a Minor Child.
S.P.M. and D.L.C.M., husband and wife, Petitioners and Appellees,
v.
DEPARTMENT OF HUMAN SERVICES, STATE OF NORTH DAKOTA, Respondent, and
M.J.G., Respondent and Appellant.
Civ. No. 940358.
Supreme Court of North Dakota.
March 16, 1995.
*865 John Oliver Thorson, Jr. (argued), Valley City, for respondent and appellant.
Bradley Allen Cruff (argued), Valley City, and Carol Susag Nelson, Valley City, for petitioners and appellees.
NEUMANN, Justice.
This is an appeal by Mark (a pseudonym), the biological father of A.M.M., from the trial court's final decree terminating his parental rights and granting A.M.M.'s stepfather's request for adoption. We affirm.
Mark and Dana (a pseudonym), who were both lifelong residents of California, conceived A.M.M. early in 1987. They were subsequently married in April of 1987 and A.M.M. was born in November. In March of 1988 Mark and Dana separated. They wrote up a separation agreement whereby Mark agreed to pay Dana $300 per month for support. In December of 1989 the two were legally divorced. Dana was granted sole custody and Mark was ordered to continue the $300 payments and granted reasonable parenting time. Mark's payments continued until March of 1993, shortly after he lost his job as a delivery driver because he was denied insurance due to his numerous traffic violations. The California courts subsequently reduced his support obligation to zero effective August 1, 1993, due to his unemployed status. Apparently Mark was still unemployed at the time of trial.
After the separation, Mark's visitation was regular, twice a week at the outset. Eventually these visits waned to between two and four per month. The visitation continued at this level until February of 1992 when Dana moved to North Dakota with A.M.M. Mark admits that he was apprised of this move in October of 1991 and never objected.
Prior to her move, Dana claims she left a forwarding address with the post office, left a forwarding number as a phone message at her old number, and informed her landlord, relatives, parents, and friends of her new address. She also claims that on at least one occasion she gave her new address to Mark on a three by five note card. Mark also knew that she would be living with a cousin with whom Mark was familiar.
Despite this, absolutely no contact occurred between Mark and his daughter from the time of the move to North Dakota in February of 1992 until a phone call in July or August of 1992. That phone call was initiated by Dana, inquiring why Mark had stopped making his child support payments. This was the only contact until Mark, through the help of legal aid, sent a letter to Dana requesting parenting time. That letter was dated October 7, 1993. The letter requested, among other things, that Mark be able to call A.M.M. every Saturday morning between 10:00 and 11:00. To this, Dana immediately agreed. Despite that, Mark never made such a call.
Between the February 1992 move and the October 7, 1993, letter, Mark never once contacted A.M.M. The only contact was initiated by Dana and occurred in either July or August of 1992. That amounts to an 18-month period in which Mark never once contacted his daughter. Since his October 7 letter, Mark has sent a couple of cards to A.M.M. along with a gift, and he met with A.M.M. for half an hour when he came to North Dakota to testify.
Mark claims that the reason for the total absence of contacts for 18 months was due to the fact that he was unable to locate Dana. Mark claimed that on at least one occasion he contacted Dana's parents, but they refused to give him Dana's address or phone number (an assertion denied by Dana's parents). Mark stated that after Dana's move he never called her old number to receive the forwarding number.
In November of 1993 Dana remarried. She married Stan (a pseudonym) and soon after he petitioned for the adoption of his stepdaughter.
Mark's appeal alleges that the trial court erred when it found that Mark's actions amounted to abandonment and also found he had failed to communicate with A.M.M. for over one year without justifiable cause. We disagree.
*866 Before Stan can legally adopt A.M.M., the legal relationship of the biological father must be severed. Kottsick v. Carlson, 241 N.W.2d 842, 844, 853 (N.D.1976). Generally, consent is required as a prerequisite to adoption of a child; consent serves to sever the original parent-child relationship. In re Adoption of A.M.B., 514 N.W.2d 670, 672 (N.D.1994). There are, however, statutory exceptions to the consent requirement. NDCC § 14-15-06(1) (1991). Consent before adoption is not required when a parent has "abandoned" a child or, "for a period of at least one year has failed significantly without justifiable cause ... to communicate with the child." NDCC § 14-15-06(1)(a), (b). Because of the sanctity of a parent-child relationship, termination of this relationship must be supported by clear and convincing evidence. See Pritchett v. Executive Director of Social Serv. Bd., 325 N.W.2d 217, 220 (N.D.1982) (stating that "the burden imposed by this court on ... actions which sever parents' rights will also be used when terminating parental rights under the Revised Uniform Adoption Act" "which is clear and convincing"). We have defined clear and convincing evidence as evidence which leads to a firm belief or conviction that allegations are true. Zundel v. Zundel, 278 N.W.2d 123, 130 (N.D.1979). We review the factual determinations in parental termination cases de novo; however, we give substantial weight to the trial court's findings. In re Adoption of A.M.B., 514 N.W.2d at 672. We recognize the trial court's superior position when questions of demeanor and credibility arise. Pritchett, 325 N.W.2d at 220.

I. Challenge to the Sufficiency of the Trial Court's Findings Under NDCC § 14-15-06(1)(a)
Mark's first challenge is to the trial court's finding that he abandoned his child. "Consent to adoption is not required of: a. A parent who has ... abandoned a child." N.D.C.C. § 14-15-06(1)(a). Because the legislature has not defined what "abandonment" means, defining this term has become a task for the judiciary. In re Adoption of A.M.B., 514 N.W.2d at 672. We have concluded that there is no simple accepted definition of what "abandon" means. Pritchett, 325 N.W.2d at 221. Abandonment is a question of fact which must be established by clear and convincing evidence. Id. Mark is challenging the sufficiency of the evidence to support the trial court's conclusion that he abandoned A.M.M.
In order to determine whether abandonment has taken place,
we look to such factors as the parent's contact and communication with the child, the parent's love, care and affection toward the child, and the parent's intent. Also relevant is the parent's acceptance of parental obligations, such as "to care for, protect, support, educate, give moral guidance to, and provide a home for the child." "A parent's negligent failure to perform his parental duties is significant to the issue of abandonment."
In re Adoption of A.M.B., 514 N.W.2d at 672 (quoting Pritchett, 325 N.W.2d at 221) (citations omitted).
Mark claims that Dana's move to North Dakota frustrated his ability to foster a relationship with his daughter. Mark contends that Dana's action completely shielded A.M.M. from any contacts with him. While we remain mindful that the termination of parental rights is a subject of gravest importance, we nonetheless maintain that, "[w]hile the ties of a natural parent are not to be treated lightly in adoption proceedings, neither should noncustodial parents treat lightly their rights and responsibilities toward their minor children." In re Guardianship of T.C.W., 235 Neb. 716, 457 N.W.2d 282, 285 (1990) (cited with approval In re Adoption of A.M.B., 514 N.W.2d at 672-73).
Mark directs this Court's attention to the fact that he paid child support for most of the time he was employed. While we applaud the fact that he has seen fit to meet this paternal obligation, we remind him that it is exactly that, an obligation. After their separation, Dana and Mark agreed to Mark's support payments of $300 per month. Upon their divorce those payments were court-ordered. We have recognized that "[j]ust as a failure to pay support does not, in itself, constitute abandonment, involuntary payment of support, in itself, is not enough to *867 avoid a finding of abandonment." In re Adoption of Gotvaslee, 312 N.W.2d 308, 316 (N.D.1981). We, like the trial court, also find it probative that all support payments ended around March of 1993, around the time Mark was terminated from his employment as a delivery person. Since then Mark has failed to secure any form of employment. He cites the difficult employment market in California for his failure. Since his unemployment began, A.M.M. has received nothing in the way of support except for two tax-intercepts amounting to slightly more than $250. Every parent has a duty to support their children. Mark's carelessness, as exhibited by his driving record, eventually made him uninsurable, thereby causing his unemployment; we cannot agree that his unemployment under these circumstances completely obviates his child support responsibility.
We recognize that Mark, at the beginning, did foster what appears to be a caring, loving relationship with his daughter. However, after A.M.M. moved and these contacts became more difficult, instead of persisting in his efforts to remain close, his efforts appear to have ceased entirely for an 18-month span. We could expect some decrease in the number of contacts after the move, but complete cessation due to inconvenience supports the trial court's finding of abandonment. Unlike the facts in In re Adoption of A.M.B., Dana did very little to frustrate Mark's attempts in locating his daughter. Apparently very little was required to totally frustrate Mark. This is not an outward sign of a parent's love, affection and desire to communicate and to foster a relationship with his child. The trial court's finding of abandonment was supported by clear and convincing evidence.

II. Challenge to the Sufficiency of the Trial Court's Findings Under NDCC § 14-15-06(1)(a), (b)
We have previously determined that failure to significantly communicate with a child without justifiable cause for at least one year can also support the termination of parental rights in the absence of parental consent. Mortenson v. Tangedahl, 317 N.W.2d 107 (N.D.1982). This ground for termination without consent is directly based on NDCC § 14-15-06(1)(b)(1).[1] Mark appears to challenge the trial court's findings on two separate bases. His first challenge relates to the significance of his contacts with his biological daughter. His second challenge appears to be directed towards the "justifiable cause" portion of the statute. He claims he was improperly kept from locating his daughter as a result of her move to North Dakota.
Mark's first challenge, that his contacts with A.M.M. were significant, must surely fail. As the record before us reveals, even Mark admits that his only contact with his daughter within an 18-month-period was a very short phone call initiated by Dana regarding his failure to pay child support. His conversation with A.M.M. was very short. In Mortenson, we permitted a termination when, within the span of one year, the parent only saw the children twice, when he took the children to play with their cousins at a nearby farm. Mortenson, 317 N.W.2d at 112. One phone call initiated by the other parent over the span of 18 months fails even to rise to the level of significance of the Mortenson facts. We therefore hold that Mark's communications are not "significant"; the trial court's findings in this regard are supported by clear and convincing evidence.
Mark's second argument, that his failure to communicate with his daughter for over 18 months was justifiable under the circumstances, we also find unpersuasive. The statute excuses the lack of significant communication with the child when "justifiable cause" exists. NDCC § 14-15-06(1)(b). Mark contends that Dana left for North Dakota without ever giving him her address or phone number. While it appears clear from the *868 record that during the phone call from Dana to Mark in July or August of 1992 Dana refused to give Mark her phone number, there existed a myriad of other means by which Mark could have obtained the information. As the trial court noted, even
[g]iving the best light to [Mark's] version, he did not contact [Dana's] cousin, Lori, whom he knew. He did not write a letter with a request that it be forwarded, he did not call [Dana's] California phone number to see if forwarding information had been left, and he made no contact with friends, or her employer, or the Court where he sent his checks to inquire about the address that might have been available for Dana, an address which she provided to the Court.
We agree with the trial court and find it especially persuasive that Mark, other than contacting Dana's parents once, which they strongly contest, never once tried to discover his daughter's whereabouts. Mark claims that he is no private investigator and, therefore, was unaware of any of these means of contacting his daughter. While it requires no sleuth to come up with these or many other modes of contact, his complete inaction remains most persuasive. The trial court's finding that there were no significant contacts and that their absence was unjustified is supported by clear and convincing evidence and therefore must stand.
Affirmed.
VANDE WALLE, C.J., and SANDSTROM, J., concur.
LEVINE, Justice, dissenting.
I respectfully dissent. The absence of significant communication was remedied, belatedly, but assuredly, by a father who obviously cared for his child and demonstrated that care by his ongoing involvement in her life until separated, not by divorce, but by close to two thousand miles of geography. Had the mother remained in California with the child, I am confident that no termination of parental rights would have occurred. Had the father been able to make regular child support payments, I am certain that no termination of parental rights would have occurred. But, the mother moved to North Dakota with the child and the father lost his job. Either event would traumatize the most loving parenta combination of the two should be viewed as justifiable cause for no contact by the father with his child.
The financial distress in as depressed a section of the country as California is a circumstance over which the father has no control. The California court recognized this and the majority ought to as well. And the mother's failure to give her telephone number to the father ought to estop her from arguing (and the majority from agreeing) that the father could have gotten her number elsewhere. We are, after all, talking about the termination of a fundamental right, the right to a parental relationship. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).
I would reverse the order terminating the father's rights and granting the stepfather's request for adoption.
MESCHKE, J., concurs.
NOTES
[1] NDCC § 14-15-06(1)(b) (1991 & Supp.1993) reads as follows:

Persons as to whom consent not requiredNotice of hearing.
1. Consent to adoption is not required of:
* * * * * *
b. A parent of a child in the custody of another, if the parent for a period of at least one year has failed significantly without justifiable cause (1) to communicate with the child or (2) to provide for the care and support of the child as required by law or judicial decree.