2013 ND 211

**In the Matter of the ADOPTION OF I.R.R.**

**M.M.R., natural mother of I.R.S., and J.A.R., adoptive parent, Petitioners and Appellees**

**v.**

**D.E.L., Jr., natural father of I.R.R., and Department of Human Services, State of North Dakota, Respondents**

**D.E.L., Jr., natural father of I.R.R., Appellant.**

No. 20130287.

Supreme Court of North Dakota.

Nov. 21, 2013.

Bobbi B. Weiler, Bismarck, N.D., for petitioners and appellees.

Susan Schmidt, Bismarck, N.D., for appellant.

KAPSNER, Justice.

[¶ 1] The biological father of a minor child appeals from an order terminating his parental rights to the child and from an order granting a petition for adoption of the child. The biological father argues he did not fail to communicate with and fail to manifest a significant parental interest in his child without justifiable cause when, while he was incarcerated, the biological

mother obtained a protection order against him, returned all correspondence and packages sent by him or his family, refused all phone or electronic communications from his family, and refused any visitation between the child and him or any of his family. We affirm the orders terminating the biological father's parental rights and granting the adoption.

I

[¶ 2] The biological father and biological mother had one child together in February 2010, but were never married. In October 2009, the biological father was arrested and has since been incarcerated. According to the biological father, he was incarcerated for possession of a controlled substance, resisting arrest, assaulting an officer, and criminal mischief. In December 2009, the biological mother obtained a domestic violence protection order against the biological father. The protection order stated the biological father was not present or represented by counsel at a hearing on the order and found he "represent[ed] a credible threat to the safety" of the biological mother. The protection order prohibited the biological father from calling, writing, visiting, or having messages delivered to the mother through anyone other than his attorney or a law enforcement officer. The order prohibited the biological father from coming within 100 yards of the biological mother's home or place of employment and a Bismarck hospital during the time of the baby's birth. The order required the biological father's visitation to be exercised through supervised visitation at the Family Safety Center at his request and expense. The order stated it was valid and effective until further order of the court.

[¶ 3] The biological mother married the adoptive father in January 2011, and in October 2012, they petitioned to terminate the biological father's parental rights to the minor child and to adopt the child. The petition alleged the biological father had been incarcerated since before the child's birth in February 2010, and had never seen or had any communication with the child except for one letter. The petition alleged the biological father did not consent to the termination of his parental rights or to the adoption of the child.

[¶ 4] At an August 2013, evidentiary hearing, the district court heard testimony from the biological mother, the biological father, the adoptive father, and the biological father's mother. The biological mother testified the biological father's only contact with the child was a letter sent in March 2011, which the mother returned because of the protection order. According to her, the protection order did not prohibit the biological father from contacting her attorney and the father's only contact with her attorney was a March 2011, letter stating he would be writing regularly. She testified she had obtained an order requiring the biological father to pay child support, but she had never received any child support from him. She further testified the father had never seen the child and she did not want to take the child to the prison for visitation. She also testified the biological father's mother was present at the hospital after the child's birth, but there has been no subsequent contact with his family and the biological mother has returned gifts and letters from them because she did not want to confuse the child.

[¶ 5] The biological father testified he was incarcerated before the child was born and he has never seen the child. He testified he sent the child a letter in 2011 after he obtained the mother's address from her attorney, but the letter was returned and prison officials told him he could not write letters to the biological mother because of the protection order. The biological father

testified he has never requested visitation, and he thought prison officials were taking money for child support from his prison paycheck but he was not sure if the money was going to the biological mother for this child, or if the money was withheld for another child.

[¶ 6] The biological father's mother testified the father's family, including his child from another relationship, wants a relationship with the child. She testified she has attempted to call the biological mother, but not in the last year or two. She testified that in her capacity as a grandmother and not on behalf of her son, she had sent presents for the child to the biological mother, but the presents have all been returned. The biological father's mother also testified she saw the child in the hospital after the child's birth and provided pictures of the child to the father, but she has had no other contact with the biological mother.

[¶ 7] After the hearing, the district court issued orders terminating the biological father's parental rights and granting the adoption petition. The court found the biological father knew the biological mother was pregnant with his child when he committed the offenses for which he was incarcerated, and he has never seen the child and attempted to send one letter to the child in March 2011. The court acknowledged the biological father's claim that his incarceration and the protection order inhibited his ability to contact the child, but said the biological father has had contact information for the biological mother's attorney since 2011 and has made no attempt to contact the attorney about parenting time or any other parental rights issues. The court found the contact attempted by the biological father's mother was on her own behalf and not at his request. The court concluded the biological father's consent to adoption was not

required under N.D.C.C. § 14–15–06(1)(b) and (j), because his conduct, without justifiable cause, constituted a significant failure to communicate with the child for one year and a significant failure to manifest a significant parental interest in the child.

## II

[¶ 8] The biological father argues he has not failed to communicate with or to manifest an interest in the child while he has been incarcerated. He asserts the district court erred in terminating his parental rights because the biological mother actively thwarted any contact or relationship between him and the child. He claims the mother obtained a protection order against him while he was incarcerated, returned all correspondence and packages sent to the child by him or his family, refused any communications with the child by him or his family, and refused any visitation between the child and him or his family.

[¶ 9] Parental consent is generally a prerequisite to adoption. *See* N.D.C.C. §§ 14–15–05 and 14–15–06. However, consent for adoption is not required from:

b. A parent of a child in the custody of another, if the parent for a period of at least one year has failed significantly without justifiable cause:

(1) To communicate with the child; or

(2) To provide for the care and support of the child as required by law or judicial decree.

. . . .

e. A parent whose parental rights have been terminated by order of court under section 14–15–19.

. . . .

j. A parent of the minor, if the failure of the parent to consent is excused by the court in the best interest of the child by reason of the parent's pro-

longed unexplained absence, unavailability, incapacity, or significant failure, without justifiable cause, to establish a substantial relationship with the minor or to manifest a significant parental interest in the minor, or by reason of inability of the court to identify the parent.

N.D.C.C. § 14–15–06(1)(b), (e) and (j).

[¶ 10] A parent's parental rights may be terminated by a court order in connection with an adoption action if the parent abandons the minor child. N.D.C.C. § 14–15–19(3)(a). "Abandon" as used in N.D.C.C. ch. 14–15 means:

As to a parent of a child not in the custody of that parent, failure by the noncustodial parent significantly without justifiable cause to:

(1) Communicate with the child; or

(2) Provide for the care and support of the child as required by law.

N.D.C.C. § 14–15–01(1)(a).

[¶ 11] This Court has said a district court should consider the following factors in deciding whether a child has been abandoned:

[W]e look to such factors as the parent's contact and communication with the child, the parent's love, care and affection toward the child, and the parent's intent. Also relevant is the parent's acceptance of parental obligations such as providing care, protection, support, education, moral guidance, and a home for the child. A casual display of interest by a parent does not preclude a finding of abandonment, and a parent's negligent failure to perform parental duties is significant to the issue.

In re Adoption of H.R.W., 2004 ND 216, ¶ 6, 689 N.W.2d 403 (citations omitted).

[¶ 12] A party seeking termination of parental rights in the context of an adoption proceeding must prove the requirements for termination by clear and convincing evidence. In re Adoption of H.G.C., 2009 ND 19, ¶ 10, 761 N.W.2d 565. "Clear and convincing evidence is evidence that leads to a firm belief or conviction the allegations are true." Id. Whether a child has been abandoned is a question of fact, and a district court's findings of fact will not be reversed on appeal unless they are clearly erroneous. In re Adoption of S.R.F., 2004 ND 150, ¶¶ 7, 10, 683 N.W.2d 913 (overruling cases applying de novo review under Revised Uniform Adoption Act and applying clearly erroneous standard of N.D.R.Civ.P. 52(a) to factual issue of abandonment). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if there is some supporting evidence, on the entire record we are left with a definite and firm conviction a mistake has been made. S.R.F., at ¶ 8.

[¶ 13] In discussing a claim that a custodial parent had frustrated a noncustodial parent's attempts to have a relationship with a child, this Court has recognized the custodial parent's actions may not be "insignificant" but the noncustodial parent must still make attempts to foster and maintain a relationship with the child. H.G.C., 2009 ND 19, ¶ 13, 761 N.W.2d 565. We explained, "[p]arental rights require more than just a biological connection; they require a relationship more enduring," and " '[w]hile the ties of a natural parent are not to be treated lightly in adoption proceedings, neither should noncustodial parents treat lightly their rights and responsibilities toward their minor children.' " Id. (quoting Matter of Adoption of A.M.M., 529 N.W.2d 864, 866 (N.D.1995)). This Court has also recognized a parent subject to incarceration or a protection order must make a greater effort to foster a nurturing relationship with

a child. *In re A.M.W.*, 2010 ND 154, ¶ 9, 786 N.W.2d 727. Incarceration alone is insufficient to establish abandonment, but incarceration with other factors such as parental neglect, withholding affection, failure to provide financial support, and lack of contact can support a finding of abandonment. *H.G.C.*, 2009 ND 19, ¶ 15, 761 N.W.2d 565. "When a parent, voluntarily and without reasonable justification, makes himself unavailable to parent a child, the child should not be expected to wait for permanency and stability in his life." *Id.* at ¶ 15. A district court may draw an inference of intent to abandon from a parent's conduct in failing to establish or maintain a relationship with the child. *A.M.W.*, at ¶ 9. A casual display of parental interest does not preclude a finding of abandonment, and a parent's negligent failure to perform parental duties is significant to the issue of abandonment. *H.G.C.*, at ¶ 14.

[¶ 14] The mother testified that since the birth she was "planning on" terminating the natural father's rights. The father testified he had no information regarding his newborn daughter; the mother moved and did not tell the father where his daughter was; and he had no contact information for his daughter until she was over a year old. Although the evidence shows the mother returned the one letter the father sent to the child, there is also evidence the father did not take any affirmative steps to foster a relationship with the child and displayed only a casual interest in the child. The district court's decision explains that although the father was incarcerated and subject to a protection order, he did not take the steps necessary to foster a relationship with his child. The evidence presented at the hearing supports the district court's findings that the biological father did not take affirmative steps to perform his parental duties and has abandoned the child. We do not re-weigh the evidence, and under this Court's standard of review, we cannot conclude the court's findings are clearly erroneous.

### III

[¶ 15] We affirm the orders terminating the biological father's parental rights and granting the adoption.

[¶ 16] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, and DANIEL J. CROTHERS, JJ., concur.

DALE V. SANDSTROM, J., concurs in the result.