### In the Matter of the WELFARE OF HGB, MAB, and DJB.

### No. 50440.

Supreme Court of Minnesota.

June 19, 1981.

John P. Alexis, Arthur Cheney, St. Paul, for fathers.

Warren Spannaus, Atty. Gen., St. Paul, Thomas Foley, County Atty., and Steven C. DeCoster, Asst. County Atty., St. Paul, for County Welfare Dept.

Arthur Seaberg, St. Paul, for guardian ad litem and the children.

TODD, Justice.

The minor children involved herein were adjudicated dependent and neglected children on November 22, 1977. In August of 1978, a petition for termination of parental rights was filed. Joyce, the mother of the minor children, was served while incarcerated in prison in Mississippi. Counsel was appointed for her. After several continuances, the termination hearing was held without Joyce being present, although she was represented by counsel. Termination was ordered, and Joyce challenges the sufficiency of the evidence and raises due process issues. We affirm.

On July 27, 1977, the Ramsey County Welfare Department filed a petition for temporary legal custody, alleging that HG, born March 24, 1972, MA, born April 10, 1974, and DJ, born October 8, 1976, were dependent and neglected. The petition alleged that their mother, Joyce, had emotional or mental disabilities, had been hysterical and angry in her contacts with a social worker, had suffered nervous breakdowns, and had lived with a known pimp who had been convicted of assault and theft; that the alleged fathers of the children did not provide them with care or support; that their mother moved frequently and at times had no permanent home;

that she had failed to provide medical follow-up care for HG and immunizations for the children; that the children were left without supervision on June 23, 1977, at which time they were picked up by the police and placed in an emergency shelter; that the mother made no contact with the welfare department about the children until June 30, 1977; and that she had failed to cooperate with the welfare department in its attempts to help her in planning for her children. At the hearing on this petition, the children were placed in temporary legal custody, and the matter was continued until September 22, 1977. It was thereafter continued until November 22, 1977.

On that date, appellant was represented by an attorney from LARC and the children by a court-appointed guardian ad litem. The admitted father of one of the children agreed to permit the welfare department to remain in custody, but appellant opposed it. After the hearing, it was adjudicated that the children were dependent and neglected. The court ordered that the legal custody be continued after finding that the children were without proper parental care because of the faults and habits of appellant; she lived with a man who had a record of several convictions, including assault; the children were without necessary subsistence or other care required for their health and morals because their mother moved frequently, did not provide them with proper immunizations and dental care, and left them alone and without food; the mother had been convicted of prostitution in August 1977 and arrested for it in October 1977; she had not visited the children since their placement in foster care on August 31, 1977; and she had failed to cooperate with the welfare department in its attempts to help her in planning for them. The court also found HG to be disturbed in social-emotional adjustment and in need of a stable home environment. Legal custody of the children remained in the welfare department to February 16, 1978.

On February 16, 1978, the matter was continued until April 13, again on that day to May 11, 1978, and the mother was ordered to cooperate with the welfare department in all recommendations until that time. On May 11, a similar order was entered, and the matter was continued to August 10. On August 10, appellant's counsel was permitted to withdraw, and the matter was then continued to October 5, 1978.

On August 24, 1978, the welfare department petitioned for termination of the parental rights of appellant and of the alleged fathers of the children for their failure to give them necessary parental care (failure to support financially, to visit, and to correct the conditions which had led to the determination of neglect and dependency). It represented that the mother had abandoned the children and that her whereabouts was unknown since March 2, 1978. The court ordered that notice of the hearing be served by publication pursuant to Minn. Stat. § 260.231, subd. 3 (1978). On September 1, 1978, and on October 5, 1978, the court ordered the matter continued until November 1, 1978, to procure service upon appellant.

On September 26, 1978, appellant telephoned Mrs. Elizabeth Burkinshaw, a social worker for the welfare department, from a jail in Mississippi, asking her about the children and saying that she (appellant) was going to prison shortly. At the hearing scheduled for November 1, appellant's attorney requested a continuance until December 27, at which time appellant's attorney informed the court that appellant contested the petition for termination of her rights and requested that she be returned to Minnesota for the trial. Prior to that date, the court also had received a letter from appellant, stating that she "would like to have this matter with my children be put off until I'm able to come back and defend myself after I'm released from prison." At the hearing on December 27, the matter was continued again, supposedly until February 26, 1979.

At the next hearing, which took place on March 5, 1979, appellant's attorney moved for continuance again, informing the court that appellant "is eligible for parole in the

latter part of May." Alternatively, he asked to be allowed to withdraw because he could not put on an effective defense. The motion for continuance was opposed by the county attorney who said that the parole hearing apparently was one to determine whether she would become eligible for parole; that her going to Mississippi where she had committed the crimes was entirely her doing; and that if she could not be present at the hearing, it was due to "her own free actions down in Mississippi." The county attorney urged that the ages of the children and the period they had been in foster care made it crucial that the hearing proceed rather than be continued because of the possibility of a parole. The court agreed, denying the alternative motion, and the trial proceeded.

The testimony of social workers established that following placement of the children in foster care on August 31, 1977, appellant made no visits to them, made no calls to inquire about them, and sent no presents or cards to them prior to the hearing on November 14, 1977. Following the dependency and neglect determination on that date, appellant missed an appointment set up with her attorney by her social worker to discuss goals for return of the children to her custody. She came to another appointment, and the goals were discussed: the need for regularly visiting the children; for finding suitable housing; for establishing financial stability; and for participating in a parent-effectiveness training program. Appellant was urged to keep regular contact with the social worker. One visit was arranged in December at the welfare office because of earlier threats by appellant to remove the children from the state and because of her hysterical behavior in talking with the social worker. At that meeting, a man with whom appellant lived, allegedly a pimp convicted of assault and theft, came with her to the visit. This proved upsetting to HG who told the social worker that she had been beaten by this man. A second visit was arranged for December 21, but appellant did not come, calling to say that she had overslept.

On January 12, 1978, appellant called the social worker from the workhouse, asking about the children and saying that she would be out in 30 days, would no longer associate with the man, and would work on the goals set for her. Edwin Holt, a Hennepin County Welfare Department social worker also working with appellant, went to see her at the workhouse to offer her assistance with transportation if needed and with references to mental agencies. Appellant told Holt that she would call him, but never did. Holt made a visit to her apartment on February 22 and found that she was again living with the man. Appellant listened to Holt review the goals and seemed optimistic about attaining them. She broke an appointment for February 28, at which time future visitations were to be scheduled, and she was to be taken to see the children at their foster homes. On March 2, appellant visited the children with a social worker and on March 6 and March 20 went by herself to see them. At the last meeting, she offered to bring a dress and some Easter baskets to HG and DJ a few days later, but did not come. An appointment to "sign a contract about goal areas" was set up for April 13, but appellant did not keep it. Her whereabouts thereafter was not known until September 26, and certified letters sent her by the social workers were being returned during that period. On September 26, as stated, appellant telephoned Mrs. Burkinshaw.

A child psychiatrist diagnosed MA as hyperkinetic, thought multiple placements were more harmful to such children than to others, and said they need permanence and stability in their emotional and affectional life. A child psychologist said that HG had been very anxious when first seen in September 1977, that her intelligence had been on the borderline range but that she had improved steadily in foster care, and that her intellectual growth had been steady. The child psychologist said that anxiety in a child often results from uncertainty and lack of security in early years, that HB still suffers greater anxiety than a normal child, and that she might need followup because of personality difficulties. The psychologist recommended adoption.

On this evidence, the court ordered that appellant's parental rights be terminated on the ground that she had substantially and continuously refused to give the children the necessary parental care and protection and that reasonable efforts under the direction of the court had failed to correct the conditions leading to the determination of dependency and neglect entered by the court on November 14, 1977.

Appellant's attorney moved for an order amending the findings or granting a new trial. Appellant appeals from the order denying this motion.

The issues presented are:

1. In a termination of parental rights proceeding, is a parent denied due process because he or she is not physically present at the hearing?

2. What are the proper considerations in a termination proceeding in light of statutory changes?

3. Does the evidence sustain an order of termination?

■ 1. The pivot point from which we start is that the substantial and fundamental rights of parents to the custody and companionship of their children should not be taken from them except for grave and weighty reasons. *McDonald v. Copperud*, 295 Minn. 440, 444, 206 N.W.2d 551, 553 (1973). Children are not property, however, but unique and vulnerable small persons entrusted to the care and protection of parents. As we have recognized, "[t]he law secures their parental right only so long as they shall promptly recognize and discharge their corresponding obligations." *Anderson v. Gibson*, 235 Minn. 192, 200, 50 N.W.2d 278, 284 (1951).

On March 5, 1979, counsel for the county and the guardian ad litem for the children opposed, and the court denied, a motion for a further continuance. The court found, on substantial evidence in the record, that reasonable efforts under the direction of the court following the 1971 determination of dependency and neglect had failed to correct the conditions leading to that determination. The court also found, from specific facts, that the mother, as well as the alleged fathers of HG and DJ and the adjudicated father of MA, had substantially and continuously refused to give the children the necessary parental care and protection. In the past, we have not reversed such findings by the juvenile court on appeal where supported, as here, by substantial evidence and where not clearly erroneous. *In re Welfare of J.M.S.*, 268 N.W.2d 424 (Minn. 1978).

It is unlikely, as the state notes, that even had the mother been present at the hearing she could have explained away 5 months of absence, silence, and total disregard in addition to her previous lack of interest and refusal to cooperate in establishing a plan for the return of the children to her custody. Nevertheless, appellant contends that these procedures denied her due process of law.

■ It is settled that the nature of due process is flexibility. The amount of process due varies with the circumstances of the case. As stated by the United States Supreme Court in *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961):

> The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. * * * [W]hat procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.

This principle has been reiterated by the Court in a number of decisions, including *Stanley v. Illinois*, 405 U.S. 645, 650–51, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972) (quoting *McElroy*). Thus, the determination of what process is due involves a balancing of the interests involved in the specific case under consideration.

■ Appellant has never, not even now, suggested what she might offer in her defense. Instead, she stands on her inability

to attend the hearing because she was in an out-of-state jail. We reject this contention. Appellant was represented by counsel. Depositions or interrogations could have been submitted. This method was recently approved by the North Dakota Supreme Court in the case of *In the Interest of F. H.*, 283 N.W.2d 202 (N.D.1979), and the absolute due process rights advocated by appellant in this case were rejected. The North Dakota court stated:

> [A] convict does not have a constitutional right to personally appear in a civil suit where he has been permitted to appear through counsel and by deposition, if appropriate. Any right to appear personally would have to rest upon convincing reasons and would ultimately be left to the sound discretion of the trial court.

*Id.* at 209. The court then listed the factors to be considered by the trial court in making its determination:

> [T]he trial court may take into account the costs and inconvenience of transporting a prisoner from his place of incarceration to the courtroom, any potential danger or security risk which the presence of a particular inmate would pose to the court, the substantiality of the matter at issue, the need for an early determination of the matter, the possibility of delaying trial until the prisoner is released, the probability of success on the merits, the integrity of the correctional system, and the interests of the inmate in presenting his testimony in person rather than by deposition.

*Id.*

The North Dakota case suggests a balancing approach with which we agree. By balancing it is not meant that the interests of parent and child are weighed equally. Instead, it is meant that both the interests of the parent and the child are considered along with the circumstances of the particular case in an effort to determine which of these interests is to predominate. Balancing, therefore, is an active process of determining the weight of two potentially opposing interests rather than a static attribution of an equal weight to each interest.

■ 2. In *In re Petition of Linehan*, 280 N.W.2d 29 (Minn.1979), this court rejected the use of the best interest of the child standard in termination of parental rights proceedings. *See also In re Welfare of J. W. M.*, 290 N.W.2d 770, 772 (Minn.1980). In 1978, however, the legislature passed amendments to the child custody act that have a significant impact on the termination of parental rights procedures. *See* Act of Mar. 28, 1978, ch. 602, 1978 Minn. Laws 365 (amending Minn.Stat. §§ 259.29, 260.-015, .111, .131, .155, .181, .191, .221, .235, .291 (1978), repealing Minn.Stat. § 257.07 (1976)). This court has not yet addressed these statutory changes. *See In re Welfare of Solomon*, 291 N.W.2d 364, 367 n.4 (Minn.1980).

Section 10 of the 1978 amendments added a new ground for the termination of parental rights to Minn.Stat. § 260.221. Act of Mar. 28, 1978, ch. 602, § 10, 1978 Minn. Laws at 370–71. Subdivision (b)(7) states as a ground for termination that "the child is neglected and in foster care." Minn.Stat. § 260.221(b)(7) (1978). This, by itself, is without particular significance, but when Minn.Stat. § 260.231, subd. 2 (1978), is examined, it incorporates into the termination of parental rights proceedings the provisions of Minn.Stat. § 260.155 (1978). *See* Minn.Stat. § 260.231, subd. 2 (1978). Minn. Stat. § 260.155, subd. 7 (1978), contains the factors for determining whether a child "is neglected and in foster care" and was also added in 1978. *See* Act of Mar. 28, 1978, ch. 602, § 6, 1978 Minn. Laws at 368–9. Subdivision 7 states as follows:

> In determining whether a child is neglected and in foster care, the court shall consider, among other factors, the following:
>
> (1) The length of time the child has been in foster care;
>
> (2) The effort the parent has made to adjust his circumstances, conduct, or condition to make it in the *child's best interest* to return him to his home in the foreseeable future, including the use of rehabilitative services offered to the parent;

(3) Whether the parent has visited the child within the nine months preceding the filing of the petition, unless it was physically or financially impossible for the parent to visit or not in the best interests of the child to be visited by the parent;

(4) The maintenance of regular contact or communication with the agency or person temporarily responsible for the child;

(5) The appropriateness and adequacy of services provided or offered to the parent to facilitate a reunion;

(6) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time; and

(7) The nature of the effort made by the responsible social service agency to rehabilitate and reunite the family.

Minn.Stat. § 260.155, subd. 7 (1978) (Emphasis added.)

Some intent must be ascribed to these legislative alterations. We conclude that the legislature intended to incorporate a balancing process into the termination of parental rights proceedings. As demonstrated by the factors listed in Minn.Stat. § 260.155, subd. 7 (1978), this process considers both the interests of the parents and the best interests of the child.

■ 3. The termination order in this case is amply supported by substantial evidence and is not clearly erroneous. Minn.R. Civ.P. 52.01.

Affirmed.

AMDAHL, J., took no part in the consideration or decision of this case.

OTIS, Justice (dissenting).

I cannot subscribe to a rule which in effect justifies a denial of due process by finding that had this mother been present at the hearing which permanently eliminated her parental rights, the likelihood of her prevailing would have been minimal.

Here the mother's whereabouts were known, she was soon to be released and available for trial, and was anxious to retain her children.

The law is well settled that failure to grant a parent an opportunity to be heard is a denial of equal protection and due process. *Stanley v. Illinois*, 405 U.S. 645, 657–58, 92 S.Ct. 1208, 1215–16, 31 L.Ed.2d 551 (1972). Equally important, the ability to confront and cross-examine witnesses is a fundamental due process right which no attorney can possibly vindicate without the presence of the parent who is the subject of the litigation. *Goldberg v. Kelly*, 397 U.S. 254, 267–71, 90 S.Ct. 1011, 1020–22, 25 L.Ed.2d 287 (1970).

I submit that to prejudge the outcome is wholly inappropriate and irrelevant to the critical question of whether the basic right to a fair trial should be protected. I would grant a new trial.

SHERAN, Chief Justice (dissenting).

I join in the dissent of Mr. Justice Otis.

YETKA, Justice (dissenting).

I concur with the dissent of Mr. Justice Otis.