532 N.W.2d 372 (1995)
In the Matter of the ADOPTION OF J.W.M., a Minor.
W.J.M., Petitioner and Appellee,
v.
J.B., JR., Respondent and Appellant, and
Henry C. "Bud" Wessman, Executive Director, North Dakota Department of Human Services, Respondent.
Civ. No. 940289.
Supreme Court of North Dakota.
May 31, 1995.
*374 John C. Skowronek (argued), Lamont & Skowronek, P.O. Box 729, Minot, for petitioner and appellee.
Robert S. Thomas (argued), Minot, for respondent and appellant.
NEUMANN, Justice.
J.B. (John)[1] appeals from a judgment terminating his parental rights to J.W.M. (James) and granting a petition for adoption by James's stepfather, W.J.M. (Walter). We hold John's due process rights were not violated by the procedures employed in the adoption proceeding and, under our de novo review, the evidence presented at the adoption hearing clearly and convincingly establishes John abandoned James. We affirm.
James was born on July 29, 1988, to John and J.M. (Joan). John and Joan have never been married, but they lived together with James in the Minneapolis, Minnesota area until December 1989. During the first three months of 1990, Joan worked on the road as an "exotic dancer," and James lived with John in the Minneapolis area. From March until December 1990, James lived with Joan in the Minneapolis area, and according to Joan, John saw James less than ten times. In December 1990, Joan and John reconciled, and they lived together with James until May 1991, when Joan and James moved to another residence in the Minneapolis area. According to Joan, John saw James four times between May and November 1991, when Joan and James moved to Minot to live with Walter. Joan and Walter were married on June 12, 1992. John has not seen James since Joan and James moved to Minot in November 1991. In September 1992 John began serving an 86-month prison sentence in Minnesota for attempting to purchase cocaine. According to Joan, between November 1991 and the filing of the adoption petition in September 1993, John called James three or four times and sent him a Christmas card and present in December 1992.
Walter's amended petition to adopt James alleged John's consent to the adoption was not required under N.D.C.C. § 14-15-06(1)(a), (b), and (j),[2] because John had abandoned James. In the adoption proceeding, John was represented by court-appointed counsel, who submitted written interrogatories to Walter, asking him to specify John's contacts with James since James's birth. In answers dated February 14, 1994, Walter summarized John's contacts with James:
"Between August 1988 and March 1990, [James] resided off and on with his mother and [John]. From March 1990 through December 1990, [John] saw [James] a few times, probably less than 10. From January 1991 through April 1991, [James] resided with his mother and [John]. Between May 1991 and September 1991, [John] saw [James] three times. In September 1991, [John] saw [James] one time. In November 1991, [John] called [James] one time. In July 1992, [John] called [James] one time. In December 1992, [John] sent a card and present to [James]. In January 1993, [John] called [James] one time. From September 1993, after receiving the adoption petition, and through the present, [John] has called [James] on three *375 occasions, and has sent him two letters and a Christmas gift."
John was incarcerated in Minnesota, and he was not permitted to personally attend the March 10, 1994 adoption hearing in Minot. However, he testified at the hearing by videotaped deposition taken on January 12, 1994. According to John, he talked to James "off and on on the phone" until he went to prison and this was "really when [he] lost contact" with James. John testified that between May 1991 and September 1993, he sent "a few hundred dollars.... Three, four, five, something like that" for support of James. At the adoption hearing, Joan used Walter's answers to the written interrogatories to refresh her memory about John's contacts with James. Joan also testified that, in March 1992, John sent her $300, but he has not provided any support for James since then.
John's counsel requested a transcript of the adoption hearing so that, before the trial court rendered its decision, John could respond to any misstatements or inaccuracies in the testimony of the witnesses. The court ultimately denied John's request, citing Thompson v. King, 393 N.W.2d 733 (N.D.1986), cert. denied, 479 U.S. 1098, 107 S.Ct. 1320, 94 L.Ed.2d 173 (1987). The court thereafter granted Walter's petition, concluding John's consent to the adoption was not required because he had abandoned James. John appealed.
John contends the trial court's denial of his request for a transcript violated his due process rights and his statutory rights under N.D.C.C. § 27-20-27(1). John concedes he did not have an absolute right to be physically present at the adoption hearing. Thompson, supra; In Interest of F.H., 283 N.W.2d 202 (N.D.1979). He argues, however, that the court's denial of his request for a transcript of the hearing to allow him to respond to inaccuracies in the testimony of witnesses deprived him of a reasonable and fair opportunity to rebut adverse testimony and to participate in the proceeding.
A parent's relationship with a biological child is entitled to constitutional protection, but that relationship is neither absolute nor unconditional. See, e.g., Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); Matter of Adoption of A.M.B., 514 N.W.2d 670 (N.D.1994); Matter of Adoption of K.A.S., 499 N.W.2d 558 (N.D.1993). The due process clause affords parents certain procedural protections before their relationship with a biological child can be irrevocably severed. Santosky, supra; Lassiter, supra; A.M.B., supra; K.A.S., supra.
In F.H., we considered the due process rights of an out-of-state prisoner in the context of a proceeding to terminate his parental rights. We held a prisoner who appeared at a termination hearing through counsel and by deposition did not have a due process right to be physically present at the hearing. We concluded the trial court did not abuse its discretion in denying the prisoner's request for a continuance until he was released from prison. See Matter of Adoption of Quenette, 341 N.W.2d 619 (N.D.1983) (trial court did not abuse its discretion in denying a request by father, an in-state prisoner, to appear personally at adoption hearing where the prisoner was represented by counsel who, at the conclusion of the hearing, declined the court's offer for additional time to depose the prisoner).
In Thompson, we considered the due process rights of a prisoner in conjunction with a stepparent's petition for adoption. We again concluded the trial court did not abuse its discretion in denying the prisoner's request for a continuance until he was released from prison. We also rejected the prisoner's argument that he was denied due process because the court refused to give him an opportunity to rebut the stepparent's evidence after reviewing a completed transcript of the hearing:
"Due process is satisfied when a convict in a proceeding for termination of parental rights and adoption is allowed to appear through counsel and by deposition.... King was represented by court-appointed counsel, had the opportunity to prepare for the adoption hearing for over a year, and was deposed in anticipation of the hearing.

*376 "We do not intend to enlarge a prisoner's due process rights in adoption proceedings by guaranteeing him the opportunity to rebut evidence presented at the hearing. To do so would lengthen the proceedings to an even greater extent. We conclude that King, in light of the protections evident in this case, is not denied procedural due process simply because he is not permitted to rebut the evidence presented at the adoption hearing."
Thompson, 393 N.W.2d at 736-37 (citation omitted).
John argues this case is factually distinguishable from F.H. and Thompson. He asserts that in F.H. the prisoner did not engage in any prehearing discovery and did not ask for an opportunity to rebut adverse testimony. He contends that in Thompson the prisoner "was a psychotic man serving 10 years for numerous sexually-related offenses," who "had not seen his child for over 5 years or tried to telephone for 4 years" and had been granted five continuances in an adoption proceeding that had been pending for nearly three years. Because of the constitutional implications involved in a parent-child relationship and the proliferation of the use of adoption proceedings to terminate the rights of parents, particularly incarcerated parents, on the ground of abandonment, we pause to examine the framework for analyzing procedural due process claims in these types of proceedings.[3]
Initially, we note many courts have followed our decision in F.H. and held prisoners do not have a due process right to personally attend a hearing to terminate their parental rights. See Pignolet v. State Dep't of Pensions & Sec., 489 So.2d 588 (Ala.Civ.App.1986); People in Interest of C.G., 885 P.2d 355 (Colo.App.1994); In re Juvenile Appeal, 187 Conn. 431, 446 A.2d 808 (1982); In Interest of J.L.D., 14 Kan.App.2d 487, 794 P.2d 319 (1990); In re Randy Scott B., 511 A.2d 450 (Me.1986); Matter of Welfare of H.G.B., 306 N.W.2d 821 (Minn.1981); State ex rel. Juvenile Dep't v. Stevens, 100 Or.App. 481, 786 P.2d 1296 (1990), rev. denied, 310 Or. 71, 792 P.2d 104 (1990), cert. denied, 498 U.S. 1119, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991); In re Interest of L.V., 240 Neb. 404, 482 N.W.2d 250 (1992); Najar v. Oman, 624 S.W.2d 385 (Tex.Ct.App.1981), cert. denied, 457 U.S. 1108, 102 S.Ct. 2909, 73 L.Ed.2d 1317 (1982); In Interest of Darrow, 32 Wash.App. 803, 649 P.2d 858 (1982). A prisoner's due process rights are generally satisfied if the prisoner is represented at the termination hearing by counsel and has an opportunity to appear by deposition or other discovery technique. See Thompson; Quenette; F.H.; J.L.D.; C.G.; Darrow.
However, the very nature of procedural due process "negates the concept of inflexible procedures universally applicable to every imaginable situation; instead, the requirements imposed by [due process] are flexible and variable and dependent upon the *377 particular situation being examined." Jensen v. Satran, 332 N.W.2d 222, 227 (N.D.1983). See Lassiter; Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Procedural due process requires fundamental fairness, which, at a minimum, necessitates notice and a meaningful opportunity for a hearing appropriate to the nature of the case. E.g., State v. One Black 1989 Cadillac, 522 N.W.2d 457 (N.D.1994); Beckler v. North Dakota Workers Compensation Bureau, 418 N.W.2d 770 (N.D.1988).
In Santosky and Lassiter, two cases involving termination of parental rights, the United States Supreme Court analyzed the flexible contours of procedural due process under the balancing test of Eldridge, 424 U.S. at 335, 96 S.Ct. at 903, which
"generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
In Santosky, the Court evaluated the three Eldridge factors and held that use of the preponderance of evidence standard of proof in proceedings to terminate parental rights violated due process. In balancing the Eldridge factors, the Court said the private interest in the accuracy of a decision to terminate parental rights is commanding and strongly favors heightened procedural protections, the risk of an erroneous termination under the preponderance of evidence standard is substantial, and the countervailing governmental interests are comparatively slight. The Court held that, before a State may completely and irrevocably sever parental rights, due process requires the allegations against the parent be supported by at least clear and convincing evidence. Santosky poignantly emphasizes that the risk of an erroneous factual decision is a critical element of due process analyses and that a heightened standard of proof protects parental rights from the dire consequences of an erroneous factual decision.
In Lassiter, the Court considered whether the federal due process clause required appointment of counsel for indigent parents in every parental status termination proceeding. The Court balanced the Eldridge factors against each other and against the presumption that an indigent litigant is entitled to appointed counsel only in cases in which deprivation of physical liberty is involved. The Court held the federal due process clause does not require appointment of counsel for indigent parents in every proceeding to terminate parental rights; rather, a trial court, in the exercise of sound judicial discretion and subject to review on appeal, must decide whether, under the circumstances of the case, due process requires the appointment of counsel for an indigent parent. Compare K.A.S. (equal protection provision of North Dakota Constitution requires appointment of counsel for indigent parent who faces termination of parental rights in proceeding under Revised Uniform Adoption Act). In Lassiter, 452 U.S. at 33, 101 S.Ct. at 2162, the Court said that, under the circumstances of that case, the "presence of counsel for [the indigent parent] could not have made a determinative difference." Lassiter also underscores the importance of analyzing how an alleged due process violation impacts the risk of an erroneous factual decision. See In the Matter of Adoption of J.S.P.L., 532 N.W.2d 653 (N.D.1995).
Under the circumstances of this case, we conclude the alleged due process violationthe denial of John's request for a transcript of the adoption hearing for review and possible cross-examination of adverse witnessesdid not result in an unacceptable risk of an erroneous factual decision. The dispositive issue at the March 10, 1994 adoption hearing involved the allegation that John had abandoned James, which necessarily encompassed the nature of John's contacts with James. At the hearing, John testified by videotaped deposition about his contacts with James. Before the hearing, John's counsel had submitted written interrogatories to *378 Walter, asking him to identify the contacts between John and James for each year since James's birth. The answers to the interrogatories, dated February 14, 1994, identified John's contacts with James. At the hearing, Joan's testimony about John's contacts with James tracked Walter's answers to the written interrogatories. Before trial, John and his counsel were thus apprised of the contacts on which Walter was relying to support the allegation of abandonment.
Although John argues the frequency, quantity, and quality of his contacts with James do not support abandonment, an issue we discuss later, we are not persuaded that the transcript of the adoption hearing disclosed any information about John's contacts with James which was not disclosed in the answers to the written interrogatories. Under these circumstances, the court's refusal to provide John with that transcript before the court made its decision did not render the proceedings fundamentally unfair. We hold the trial court's denial of John's request for a transcript of the hearing for possible cross-examination of adverse witnesses did not deny him due process. The trial court did not abuse its discretion in denying John's request.
Other than quoting N.D.C.C. § 27-20-27(1),[4] John has cited no authority for his separate argument that the trial court's denial of his request for a transcript of the hearing deprived him of his statutory right "to introduce evidence and otherwise be heard in his own behalf and to cross-examine adverse witnesses." John was represented by court-appointed counsel at the adoption hearing, and he testified by videotaped deposition. John was not denied his statutory rights under N.D.C.C. § 27-20-27(1).
John argues he was denied due process because the trial court terminated his parental rights "without clear and convincing evidence of parental unfitness." He asserts "the trial court appears to rely on the premise that proof of abandonment alone is sufficient to terminate parental rights," and argues the "United States Supreme Court has held that parental rights may not be terminated absent a showing, by clear and convincing evidence, that the parent is `unfit,'" citing Santosky, 455 U.S. at 760, n. 10, 102 S.Ct. at 1398, n. 10.
Our statutes specify abandonment as a ground for terminating parental rights. See N.D.C.C. §§ 27-20-44(1); 14-15-19(3). In Santosky, the Court dealt with the standard of proof required for termination of parental rights, not with the substantive grounds for termination of parental rights. In Santosky, the Court did not hold that parental rights could be terminated only for parental unfitness; rather, the Court specifically held "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." Santosky, 455 U.S. at 747-48, 102 S.Ct. at 1391-92. We reject John's argument that due process requires parental rights can be terminated only on the ground of parental "unfitness."
To the extent John argues the trial court did not apply a clear and convincing standard of proof to the issue of abandonment, we also disagree. We have defined clear and convincing evidence as that which leads to a firm belief or conviction that the allegations are true. In the Matter of Adoption of A.M.M., 529 N.W.2d 864 (N.D.1995). Although the trial court's findings of fact do not specifically recite that the court found clear and convincing evidence of abandonment, the court's memorandum opinion may be used to clarify its findings. E.g., Halvorson v. Halvorson, 482 N.W.2d 869 (N.D.1992). The court's memorandum opinion says "[t]here is no question in my mind that [John] has abandoned [James]." Moreover, during an exchange with counsel at trial, the court confirmed "the burden of proof on abandonment is ... clear and convincing evidence." We conclude the trial court applied the clear and convincing standard of proof to the issue of abandonment.
*379 John argues the evidence introduced at the adoption hearing did not clearly and convincingly establish his abandonment of James.
Parental rights do not spring full blown from the biological connection between parent and child; instead, they require relationships more enduring. A.M.M; A.M.B. A biological parent's relationship with a child is subject to constitutional protection; however, we have warned "`[w]hile the ties of a natural parent are not to be treated lightly in adoption proceedings, neither should noncustodial parents treat lightly their rights and responsibilities toward their minor children.'" A.M.B., 514 N.W.2d at 672-73, quoting In re Guardianship of T.C.W., 235 Neb. 716, 457 N.W.2d 282, 285 (1990). See also A.M.M.
The Legislature has not defined abandonment, and we have recognized "there is no single accepted definition of what ... `abandon' means." Pritchett v. Executive Director of Social Service Board, 325 N.W.2d 217, 221 (N.D.1982). In determining whether abandonment has taken place, we look to factors such as the parent's contact and communication with the child, the parent's love, care and affection toward the child, and the parent's intent. Id. Also relevant is the parent's acceptance of parental obligations, such as "to care for, protect, support, educate, give moral guidance to, and provide a home for the child." Id. at 221.
Abandonment is a question of fact, which must be established by clear and convincing evidence. Id. A person petitioning to adopt a child against the consent of a natural parent carries a heavy burden of showing abandonment. Matter of Adoption of Gotvaslee, 312 N.W.2d 308 (N.D.1981). We review factual determinations in adoption and parental termination proceedings in a manner similar to the former procedure of trial de novo; however, we give substantial weight to the trial court's findings because of its superior position to decide questions of demeanor and credibility. A.M.B.; Pritchett.
Here, the trial court concluded John had abandoned James. According to Joan, John sent her $300 in March 1992, and he has not provided any support for James since then. According to John, between May 1991 and September 1993, he sent "a few hundred dollars.... Three, four, five, something like that" for support of James. John also testified he earned about $240 per month as a prison janitor, but he used the money to pay for storage of his personal property and he regularly sent money to his current girlfriend. John's failure to provide support for James, while paying for the storage of personal property and regularly sending money to his current girlfriend, is highly probative of his lack of acceptance of his parental responsibilities toward James. See A.M.M.; A.M.B.
Joan's testimony also indicates John had irregular contacts with James since May 1991 and most of those contacts were initiated by her. She testified John saw James three or four times between May and September 1991, and he talked to James on the phone once in November 1991, once in July 1992, and once in January 1993. She also testified John sent a card and a present to James in December 1992. John testified he talked to James "off and on on the phone" until he went to prison and that is "really when [he] lost contact" with James. Incarceration, by itself, is insufficient to establish abandonment. Thompson; Quenette; F.H. However, incarceration coupled with other factors such as parental neglect, withholding of affection, lack of financial or other support, and no contact can support a finding of abandonment. Thompson; Quenette; F.H. Although John's incarceration by itself does not establish abandonment, his irregular contacts with James are also indicative of a failure to significantly communicate with James and foster an enduring relationship with him.
A casual display of interest by a parent does not preclude a finding of abandonment; a parent's negligent failure to perform parental duties is significant to the issue of abandonment. Pritchett. Although John claims there is no evidence he intended to abandon James, John's intent may be inferred from circumstantial evidence such as his conduct. In Interest of C.K.H., 458 *380 N.W.2d 303 (N.D.1990); Pritchett; Gotvaslee. Here, John's irregular contacts with James and failure to provide support for him, while paying for storage of his personal property and providing support for a current girlfriend, are highly indicative of John's intent. After a de novo review of the evidence and giving appreciable weight to the findings of the trial court, we conclude the evidence clearly and convincingly establishes John abandoned James.
We affirm the judgment terminating John's parental rights and granting Walter's petition for adoption.
VANDE WALLE, C.J., and SANDSTROM, J., concur.
LEVINE, Justice, dissenting.
I respectfully dissent. This may be a close case, but close cases, combined with our de novo review, ought to be decided in favor of a parent's constitutionally protected right to maintain a parent-child relationship. The remedy for nonpayment of child support is a request for a support order, not termination of parental rights. We have not rid ourselves of debtor prisons only to substitute for that Dickensian horror, the termination of the debtor's parental rights. See generally George Muhar, "Incarceration and Termination of Parental Rights," 12 J.Juv.L. 70 (1991) [contending incarcerated parents have to fear termination of their parental rights as well as loss of liberty].
Apparently, the fact that John sent money to his girlfriend to use for her and her children's support is the clincher here. Yet, notwithstanding section 14-07-17, NDCC, which must be carefully limited in order to accommodate a father's constitutional fundamental right to a relationship with his child, James' rights are not being terminated for nonsupport, but for abandonment.
The record simply does not support the trial court's finding that John has intentionally abandoned James. The majority does not, nor could it, rely solely on John's incarceration to find abandonment and terminate his rights. See Thompson v. King, 393 N.W.2d 733 (N.D.1986); In Interest of F.H., 283 N.W.2d 202 (N.D.1979). Incarceration must be combined with other factors which would support a finding of abandonment by a nonincarcerated parent. F.H., supra. The question of abandonment is one of intent, based upon the facts of each case. Pritchett v. Exec. Dir. of Social Service Board, 325 N.W.2d 217 (N.D.1982). Plainly speaking, the trial court thought that Walter would make a better parent for James; however, that is not the proper inquiry in a case alleging abandonment and effectively terminating a natural parent's rights through adoption. The proper determination for the trial court is whether a natural parent's conduct demonstrates a course of conduct suggesting conscious disregard of or indifference to parental obligations, Pritchett, supra, thus forfeiting his constitutionally protected fundamental right to a relationship with his child. Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). See F.H., supra at 214. Whether an incarcerated parent intends to abandon his parental responsibilities may be inferred from his conduct both before and after his imprisonment. Thompson, supra.
Prior to the mother's move to North Dakota, and until James was nearly three years old, John lived with and helped care for James. Even after the mother moved out of John's home, taking James with her, John had visitation approximately one weekend per month and "babysat" for James at the mother's request. The mother testified that shortly after her unannounced move to North Dakota, John called her and told her he was upset that she had taken "his son."
Since the adoption petition was filed and while incarcerated, John has phoned James three times and sent two letters and a Christmas gift. Cf. Thompson, supra [finding parent made no attempt to contact child, by telephone or letter, after parent's incarceration]; F.H., supra [terminating father's rights when father had known about mother's pregnancy but moved away, failed to inquire about child or send support and was subsequently incarcerated]; In Interest of L.V., 482 N.W.2d 250 (Neb.1992) [finding abandonment when father was incarcerated for most of child's infancy, had visited child only once during infancy and then moved to *381 Texas without notifying mother, where he was incarcerated for aggravated sexual assault of a child]. Given the circumstances, the mother's move to North Dakota and John's subsequent imprisonment, it seems to me that John has made an effort to stay in contact with both the mother and James. See In the Matter of the Adoption of G.F.C., 118 Misc.2d 705, 461 N.Y.S.2d 949 (Sur.1983); In re Guardianship of Sain, 217 Neb. 96, 348 N.W.2d 435 (1984) [intent to abandon may be mitigated by circumstances].
There is no public policy that says it is bad for a child to have a father and a stepfather. See Matter of Adoption of K.S.H., 442 N.W.2d 417 (N.D.1989) [affirming trial court's refusal to terminate father's rights when child was adequately cared for by grandparents and no serious harm shown if father's rights were not terminated]. See also Candace M. Zierdt, "Make New Parents But Keep the Old." 69 N.D.L.Rev. 497 (1993). The fact that two men love James enough to go to court to fight for a legal bond to him indicates to me a benefit to James, not a detriment. That Walter wants sole billing should not carry the day.
I respectfully dissent.
Meschke, J., concurs.
NOTES
[1] All names used in this opinion are pseudonyms.
[2] Section 14-15-06(1), N.D.C.C., says:

"1. Consent to adoption is not required of:
"a. A parent who has deserted a child without affording means of identification, or who has abandoned a child.
"b. A parent of a child in the custody of another, if the parent for a period of at least one year has failed significantly without justifiable cause (1) to communicate with the child or (2) to provide for the care and support of the child as required by law or judicial decree.
* * * * * *
"j. A parent of the minor, if the failure of the parent to consent is excused by the court in the best interest of the child by reason of the parent's prolonged unexplained absence, unavailability, incapacity, or significant failure, without justifiable cause, to establish a substantial relationship with the minor or to manifest a significant parental interest in the minor, or by reason of inability of the court to identify the parent."
[3] Our statutes allow a court to involuntarily terminate parental rights under three separate procedures: (1) the Uniform Juvenile Court Act (see N.D.C.C. §§ 27-20-44 and 27-20-45); (2) the Uniform Parentage Act (see N.D.C.C. § 14-17-24); or (3) the Revised Uniform Adoption Act (see N.D.C.C. § 14-15-19). See K.A.S., supra.

The Uniform Juvenile Court Act authorizes involuntary termination of parental rights if a parent has abandoned a child, or if the child is deprived. N.D.C.C. § 27-20-44(1). The Uniform Parentage Act permits involuntary termination of parental rights of a biological father if he fails to appear at a hearing to determine paternity, or if he fails to claim custodial rights to a child. N.D.C.C. § 14-17-24(3) and (4).
The Revised Uniform Adoption Act authorizes termination of parental rights on any ground provided by other law and on the grounds a parent has abandoned a child; a noncustodial parent unreasonably withholds consent to termination, contrary to the best interests of a child; or by reason of a parent's misconduct, faults, habits, repeated neglect, or physical or mental incapacity, a child is without proper parental control and care and the conditions of the behavior, neglect, or incapacity will continue and will cause the child serious physical, mental, moral, or emotional harm. N.D.C.C. § 14-15-19(3). Except with respect to the spouse of a petitioner, the effect of an adoption decree is to terminate the parental rights of a child's natural parents. N.D.C.C. § 14-15-14. Generally, consent of a natural parent is a prerequisite to a stepparent adoption. N.D.C.C. § 14-15-05; In Interest of A.M.M., 529 N.W.2d 864 (N.D.1995); In re Adoption of A.M.B., 514 N.W.2d 670 (N.D.1994). Section 14-15-06(1)(a), N.D.C.C., of the Revised Uniform Adoption Act says a natural parent's consent to an adoption is not required if the parent has abandoned the child.
[4] Section 27-20-27(1), N.D.C.C., says:

"1. A party is entitled to the opportunity to introduce evidence and otherwise be heard in his own behalf and to cross-examine adverse witnesses."