*2007 ND 102*

**In the Interest of D.C.S.H.C., a child**

**Tamera Ressler, L.S.W., Petitioner and Appellee**

**v.**

**K.C., Respondent and Appellant**

**J.B., J.D., B.C., and Dixie Evans or designee, Lay Guardian ad Litem, Respondents.**

**Nos. 20060337, 20060338.**

Supreme Court of North Dakota.

June 26, 2007.

Constance L. Cleveland, Assistant State's Attorney, Fargo, N.D., for petitioner and appellee.

Joe A. Johnson, Fargo, N.D., for respondent and appellant.

SANDSTROM, Justice.

[¶ 1] K.C., the mother, appeals the order adopting the judicial referee's findings and order terminating K.C.'s parental rights to D.C.S.H.C., the child. Concluding that K.C. was given a meaningful opportunity to be heard through her appearance by telephone at the termination hearing while she was in prison in Minnesota, we affirm.

I

[¶ 2] In 2005, the child was born while her mother was involuntarily committed at the North Dakota State Hospital and her father was in jail in Cass County. On the same day as the birth, a social worker petitioned for a finding that the child was deprived. A judicial referee issued an emergency order temporarily removing the child from her parents' custody and placing her with Cass County Social Services. After the birth, the mother was released from the State Hospital. Less than a week after the birth, the referee found probable cause that the child was deprived, largely because of her parents' drug and alcohol abuse and extensive criminal history. Sometime after her release from the State Hospital, K.C. was incarcerated in Stutsman County, North Dakota. On February 17, 2006, the referee issued a writ of habeas corpus ad testificandum requesting that K.C. be transported from Stutsman County to Cass County for the termination hearing scheduled for March 15–17, 2006. According to K.C.'s case manager's testimony at the termination hearing, K.C. was incarcerated at the correctional facility at Shakopee, Minnesota, on March 3, 2006. On March 13, 2006, the judicial referee amended the writ to include the same transportation request for the Director of the Minnesota Department of Corrections. The Minnesota Department of Corrections did not release K.C. for the hearing. On March 15, K.C. appeared by telephone at the termination hearing and requested the hearing be rescheduled so she could appear in person. She did not ask for a specific future date. The Shakopee case manager testified that K.C.'s anticipated release date was July 31, 2006; however, he also testified that K.C. had a pending felony charge in Stearns County, Minnesota. The referee denied her request and reminded K.C. that she would be represented by "very conscientious counsel" throughout the proceedings. The referee did allow her to testify by telephone whenever officials at Shakopee would allow her to use a telephone during the three-day hearing. The referee ordered the parents' rights terminated. The mother requested a juvenile court review of the referee's decision.

[¶ 3] In November 2006, the juvenile court adopted the referee's order and terminated both parents' rights to the child. The court also concluded the mother was not denied her right to a full and fair hearing, because she was represented by counsel and she appeared by telephone at the hearing. Only K.C. appeals.

[¶ 4] The juvenile court had jurisdiction under N.D.C.C. § 27-20-03(1)(b). The district court judge had jurisdiction

under N.D. Sup.Ct. Admin. R. 13(11) to review the referee's findings and order. The notice of appeal was timely under N.D.C.C. § 27–20–56(1). This Court has jurisdiction under N.D. Const. art. VI, §§ 2, 6, and N.D.C.C. § 27–20–56(1).

## II

[¶ 5] K.C., the mother, contends the juvenile court abused its discretion by denying her request to postpone the termination proceeding so that she could appear in person at the hearing. She also contends her sporadic participation by telephone at the termination hearing denied her due process.

## A

[¶ 6] A motion for a continuance "will be granted only for good cause shown, either by affidavit or otherwise." N.D.R.Ct. 6.1(b). "We will not reverse a trial court's decision to deny a continuance absent an abuse of discretion." *State v. Hilgers,* 2004 ND 160, ¶ 38, 685 N.W.2d 109 (citation omitted). "A trial court abuses its discretion only when it acts in an arbitrary, unreasonable, or capricious manner, or misinterprets or misapplies the law." *State v. Stoppleworth,* 2003 ND 137, ¶ 6, 667 N.W.2d 586.

[¶ 7] The juvenile court concluded the referee properly denied K.C.'s motion for a continuance:

The Respondent was in the Shakopee prison facility at the time of the hearing. The North Dakota Supreme Court has held that prisoners do not have a constitutional due process right to personally appear at a proceeding for termination of parental rights, and *their due process rights are satisfied if they are represented by counsel and have an opportunity to appear by deposition or other discovery technique.* [*Adoption of J.M.H.*], 1997 ND 99, ¶ 18, 564 N.W.2d 623 (hold-

ing where defendant testified at the termination hearing by telephone and was represented by court-appointed counsel during the proceeding there was no due process violation). Here, Respondent also testified at the termination hearing by telephone and was represented by court-appointed counsel. As such, the Respondent's claim fails.

(Emphasis added.)

[¶ 8] In *St. Claire v. St. Claire,* we concluded that a parent-prisoner has a limited right to appear in person at a termination of parental rights hearing:

[A] prisoner's right to appear personally at a civil proceeding is limited. *Walbert v. Walbert,* 1997 ND 164, ¶ 8, 567 N.W.2d 829. In the context of parental rights termination there is a statutory right to counsel under N.D.C.C. § 27–20–26, and "[p]risoners' due process rights generally are satisfied if they are represented by counsel and have an opportunity to appear by deposition or other discovery technique." *In re Adoption of J.M.H.,* 1997 ND 99, ¶ 18, 564 N.W.2d 623. Generally, "[p]rocedural due process requires fundamental fairness, which, at a minimum, necessitates notice and a meaningful opportunity for a hearing appropriate to the nature of the case." *Walbert,* at ¶ 9 (quoting *In re Adoption of J.W.M.,* 532 N.W.2d 372, 377 (N.D.1995)). *A person's right to appear may be satisfied by allowing appearance via telephone. Cf. id.; see also State v. Valentine,* 190 Ariz. 107, 945 P.2d 828, 831 (Ct.App.1997) ("We therefore hold, as have other states, that appearance by telephone is an appropriate alternative to personal appearance").

*St. Claire v. St. Claire,* 2004 ND 39, ¶ 6, 675 N.W.2d 175 (emphasis added).

[¶ 9] Because prisoners do not have a constitutional right to appear in person at

a termination-of-parental-rights hearing and because children should not be kept in limbo between foster care and permanent placement, *see Interest of D.M.*, 2007 ND 62, ¶ 17, 730 N.W.2d 604, K.C.'s motion for a continuance was properly denied.

B

[¶ 10] K.C. contends her limited participation by telephone at the termination hearing violated her right to procedural due process.

[¶ 11] Under the Fourteenth Amendment, no State may "deprive any person of life, liberty or property, without due process of law...." U.S. Const. amend. XIV, § 1. Article I, section 12 of the North Dakota Constitution also provides: "No person shall ... be deprived of life, liberty or property without due process of law." "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)).

[¶ 12] This Court has held that a "prisoner's due process rights are generally satisfied if the prisoner is represented at the termination hearing by counsel and has an opportunity to appear by deposition or other discovery technique." *Adoption of J.W.M.*, 532 N.W.2d 372, 376 (N.D. 1995), *overruled on other grounds, Adoption of S.R.F.*, 2004 ND 150, ¶ 7, 683 N.W.2d 913 (overruling those cases that apply a de novo review under the Revised Uniform Adoption Act). We have also held there is no denial of due process when the defendant testified at the termination hearing by telephone and was represented by court-appointed counsel during the proceeding. *Adoption of J.M.H.*, 1997 ND 99, ¶ 19, 564 N.W.2d 623. Within this framework we consider our prior holdings and the facts of this case as we can discern them.

[¶ 13] "A parent's relationship with a biological child is entitled to constitutional protection, but that relationship is neither absolute nor unconditional." *Adoption of S.A.L.*, 2002 ND 178, ¶ 10, 652 N.W.2d 912 (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 26–27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); *Adoption of K.A.S.*, 499 N.W.2d 558, 567 (N.D.1993)). "A court, however, cannot irrevocably sever a parent's relationship with a biological child without first granting the parent certain procedural protections afforded by due process." *Adoption of S.A.L.*, at ¶ 10.

[¶ 14] A court must apply a three-part balancing test to analyze whether the procedures pass constitutional muster:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Adoption of S.A.L.*, 2002 ND 178, ¶ 11, 652 N.W.2d 912 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)); *see, e.g., Santosky v. Kramer*, 455 U.S. 745, 758, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("In parental rights termination proceedings, the private interest affected is commanding; the risk of error from using a preponderance standard is substantial; and the countervailing governmental interest favoring that standard is comparatively slight .... use of a

'fair preponderance of the evidence' standard in such proceedings is inconsistent with due process."); *Adoption of J.W.M.*, 532 N.W.2d 372, 377–80 (N.D.1995) (applying the *Eldridge* factors and concluding the denial of a parent's request for a transcript of the adoption hearing for review and cross-examination of adverse witnesses "did not result in an unacceptable risk of an erroneous factual decision").

[¶ 15] Here, the alleged due process violation is K.C.'s sporadic participation by telephone at the termination hearing. Whether the risk of error from this telephonic appearance is so substantial as to offend due process is analyzed under the three *Eldridge* factors.

1

[¶ 16] The first *Eldridge* factor is "the private interest that will be affected by the official action." *Eldridge*, 424 U.S. at 335, 96 S.Ct. 893; *Adoption of S.A.L.*, 2002 ND 178, ¶ 11, 652 N.W.2d 912.

> *Lassiter* declared it "plain beyond the need for multiple citation" that a natural parent's "desire for and right to 'the companionship, care, custody, and management of his or her children'" is an interest far more precious than any property right. 452 U.S., at 27, 101 S.Ct. 2153 quoting *Stanley v. Illinois*, 405 U.S., at 651, 92 S.Ct. 1208. When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. "If the State prevails, it will have worked a unique kind of deprivation.... *A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one.*" 452 U.S., at 27, 101 S.Ct. 2153.

*Santosky*, 455 U.S. at 758–59, 102 S.Ct. 1388 (emphasis added).

[¶ 17] Here, the private interest is the mother's fundamental liberty interest;

the father voluntarily relinquished his parental rights and is not participating in this appeal. "[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship. Thus, at the factfinding, the interests of the child and his natural parents coincide to favor use of error-reducing procedures." *Santosky*, 455 U.S. at 760–61, 102 S.Ct. 1388. Therefore, given that the private interest in termination proceedings is "a commanding one," *see id.* at 759, 102 S.Ct. 1388, this factor weighs in favor of allowing a parent-prisoner to appear by telephone for the entire proceeding.

2

[¶ 18] The second *Eldridge* factor is "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Eldridge*, 424 U.S. at 335, 96 S.Ct. 893; *Adoption of S.A.L.*, 2002 ND 178, ¶ 11, 652 N.W.2d 912.

[¶ 19] The procedures used in K.C.'s termination hearing closely resemble those in *Santosky*, which the United States Supreme Court likened to a criminal trial:

> The Commissioner of Social Services charges the parents with permanent neglect. They are served by summons. The factfinding hearing is conducted pursuant to formal rules of evidence. The State, the parents, and the child are all represented by counsel. The State seeks to establish a series of historical facts about the intensity of its agency's efforts to reunite the family, the infrequency and insubstantiality of the parents' contacts with their child, and the parents' inability or unwillingness to formulate a plan for the child's future. The

attorneys submit documentary evidence, and call witnesses who are subject to cross-examination. Based on all the evidence, the judge then determines whether the State has proved the statutory elements of permanent neglect by a fair preponderance of the evidence.

*Santosky*, 455 U.S. at 762, 769, 102 S.Ct. 1388 (internal citations omitted).

[¶ 20] Not only is K.C. one of the natural parents, but she is also an out-of-state prisoner. As we have previously noted, "the district court does not have authority to order a Minnesota prison to allow [the Respondent] to appear in a civil case." *St. Claire v. St. Claire*, 2004 ND 39, ¶ 8, 675 N.W.2d 175. Additional or substitute procedural safeguards were largely unavailable in this case. The warden of the Minnesota Correctional Facility at Shakopee controls K.C.'s liberty, including her access to telephones, as evidenced by the following excerpt from the transcript of the first day of the termination hearing:

> [K.C.]: And I'm sorry, please if the Court would excuse me, my caseworker here is telling me he must go, he has another appointment, which means that I'm going to have to go for today. I'm not going to be available to even take notes or to hear testimony. I'm sorry for interrupting ... there's nothing that I can do at this time to—other than interrupt .... if Mr. Nesheim, if you can call and speak with my caseworker at some point this afternoon and maybe perhaps speak with me, I have some issues I need to discuss with you .... if the Court would accept my apologies, but I had no choice but to wait for a break in testimony because he has an appointment and there's nothing that can be done at this point.
>
> THE COURT: Okay. [K.C.], listen, your counsel will be speaking with you later today, so don't worry about that. And he is taking notes ....
>
> MR. NESHEIM: I just wanted to clarify that I will try to speak to her later today.
>
> THE COURT: Well, yes.
>
> MR. NESHEIM: It will be up to her case manager. I will talk to him later today.
>
> THE COURT: Yes. Again, these things are out of our control. That's the whole point.
>
> [K.C.]: Right. Right.

A review of the hearing transcript reveals that K.C. was present for a portion of the hearing on the first day and on the last day when she testified. In the morning on the second day of the hearing, the referee twice asked K.C.'s counsel if she would be available by telephone for the day's proceedings. K.C.'s counsel explained that he thought she would be available at 1:30 p.m.; however, attempts to contact K.C. on that day were unsuccessful:

> MS. CLEVELAND: I would ask that the Court further elaborate on the record the status of our efforts to contact and make available for period of time the Respondent, [K.C.]. We commenced—or I believe that the Court commenced calling at about 1:30. It is now 10 to 2:00, and the staff has been diligently in contact with their facility, has in fact been on the phone with their facility, and for reasons that are not being explained to us she is—well, that I—that are not clear to me she is not at the phone. And at this point they're not providing exact information as to why that is. But Ms. Frier indicated that she would continue to be in contact with them throughout the afternoon. So if that changes my guess she'll let us know and we can deal with that at the time.
> ....

THE COURT: Yeah. And it's good to have it on the record. We have not done anything that I'm aware of to preclude her presence here by telephone. It has been entirely at the direction of her facility and we have had nothing to do with that. As far as we were concerned we were glad to have her participate.

At the end of the second day of the hearing, the referee again inquired about K.C.'s availability:

THE COURT: I wanted to give sort of a little caveat to this, too. I do expect her to be present to testify if she intends to. And if she is not present I want to know why.

MR. NESHEIM: Okay.

THE COURT: Because, you know, we just can't go on indefinitely. And we just don't do this in these proceedings. If they want to testify, fine, but—

MR. NESHEIM: I understand.

THE COURT: If there's a reason that the facility will not allow her to I want to know what it is. Because if it's her behavior that's causing it then we'll just go without it. And that's as simple as I can be about it.

MS. CLEVELAND: Just so—sorry. What we anticipate her to appear by telephone and testify tomorrow; is that kind of the plan maybe?

MR. NESHEIM: That's what I discussed with [K.C.'s case manager].

[¶ 21]   On March 17, the final day of the hearing, K.C. appeared by telephone and was questioned by both sides and by the guardian ad litem. She addressed her many suicide attempts, which she said were only attempts to manipulate the criminal justice system to get a reduced sentence. She was allowed to explain her plan for caring for the child, including the various classes and therapy sessions she has completed or intends to complete. She disputed the allegation that she had intentionally tried to injure herself while pregnant. She admitted drinking "a few sips" of alcohol while she was pregnant. She admitted having exposed the child to cocaine prenatally. She testified that she was participating in Alcohol and Narcotics Anonymous. She explained that she had good jobs waiting for her, as well as a trailer in Grafton, and only a small amount of unpaid restitution. She testified that she has her bachelor's degree and plans on getting her master's degree. She also was able to address her disorderly behavior while incarcerated, which she claimed was the product of being repeatedly humiliated by jail staff.

[¶ 22]   K.C. was able to provide an alternate version of the facts that would support her opposition to the termination of her parental rights. The court was then left with the task of resolving any conflicting testimony. We conclude K.C. was afforded a meaningful opportunity to be heard in this case.

[¶ 23]   This factor weighs in support of the juvenile court's conclusion that K.C.'s right to procedural due process was not violated.

3

[¶ 24]   The final *Eldridge* factor is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Eldridge*, 424 U.S. at 335, 96 S.Ct. 893; *Adoption of S.A.L.*, 2002 ND 178, ¶ 11, 652 N.W.2d 912. "Two state interests are at stake in parental rights termination proceedings—[an] interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings." *Santosky*, 455 U.S. at 766, 102 S.Ct. 1388.

[¶ 25]   In this case, K.C. was incarcerated in Shakopee, Minnesota.  The limitation on K.C.'s participation was beyond the court's control, because Minnesota correctional officials controlled her access to the telephone.   As discussed previously, the additional procedural safeguard of a continuance to allow K.C. to appear in person was also not an option because she was a prisoner, incarcerated in another state.  The court could have reasonably found that the cost of transportation, meals, and lodging would have been significant.  The court could have also reasonably found that K.C. posed a substantial threat to the security of the proceeding.  The juvenile court found K.C.'s "suicide attempts were used to manipulate to get out of jail," and she has had "approximately twenty-four total felony and misdemeanor convictions," as well as "six incidents in the Shakopee facility, including one major disorderly conduct infraction."  Furthermore, she "has also harmed, or attempted to harm, [the child] while she was pregnant . . . she would run into walls [and] beat[] her stomach."  "She attempted suicide four times, three times while she was pregnant."

[¶ 26]   This factor weighs in favor of the juvenile court's decision.

### C

[¶ 27]   Because a prisoner does not have a constitutional right to appear in person at a termination-of-parental-rights hearing, the motion for a continuance to allow K.C. to appear in person was properly denied.

[¶ 28]   On this record, the mother's "commanding" interest in the accuracy and justice of the decision to terminate her parental rights was outweighed by the procedural safeguards available and used as well as the State's interest in reducing the fiscal and administrative burdens of the proceeding.  Whether a parent-prisoner's rights to procedural due process are satisfied by a limited appearance by telephone does not lend itself to a bright-line rule; instead, a case-by-case balancing of the *Eldridge* factors must be conducted to ensure that notice and a meaningful opportunity to be heard exist in every case in which a parent-prisoner's appearance is so limited.

### III

[¶ 29]   We affirm the order adopting the judicial referee's findings and order terminating K.C.'s parental rights to D.C.S.H.C.

[¶ 30]   GERALD W. VANDEWALLE, C.J., DANIEL J. CROTHERS, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER., JJ., concur.