# IN THE SUPREME COURT OF IOWA

No. 18–0947

Filed November 30, 2018

IN THE INTEREST OF M.D., K.T., G.A., AND S.A.,
Minor Children.

vs.

**K.A.,** Mother,
　　　　Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Ida County, Patrick H. Tott, Judge.

An incarcerated parent appeals an order by juvenile court terminating her parental rights. **DECISION OF THE COURT OF APPEALS VACATED; JUVENILE COURT DECISION REVERSED AND REMANDED.**

Robert B. Deck of Deck Law PLC, Sioux City, for appellant.

Thomas J. Miller, Attorney General, Kathryn K. Lang, Assistant Attorney General, Meghann Cosgrove-Whitmer, County Attorney, and Kristal L. Phillips, Assistant County Attorney, for appellee.

Lesley D. Rynell, Public Defender, Sioux City, guardian ad litem for minor children.

**CADY, Chief Justice.**

In this appeal, we must decide the extent to which an incarcerated parent is entitled to participate from prison by telephone in a hearing to terminate parental rights. The juvenile court permitted the parent to participate in the hearing by telephone but only to give testimony and entered an order terminating parental rights following the hearing. On appeal, the court of appeals affirmed the decision of the juvenile court. On further review, we vacate the decision of the court of appeals, reverse the decision of the juvenile court, and remand the case for an expedited hearing consistent with the procedure set forth in this opinion. We conclude an incarcerated parent is entitled to participate from a prison or jail facility in the entire hearing for termination of parental rights.

## I. Background Facts and Proceedings.

The juvenile court in Ida County terminated the parental rights of a mother to her five children on May 22, 2018, following a hearing. The children had been removed from the mother's care prior to the hearing primarily due to her chronic drug and alcohol abuse. She had used methamphetamines off and on for years and was convicted and sentenced to prison in 2010 for manufacturing methamphetamine. The mother consumed and manufactured methamphetamine in the presence of the children, and her drug addiction adversely impacted her ability to parent and attend to the needs and development of her children.[1] The children were in the care of their respective fathers at the time of the termination hearing.

---

[1]One of the most serious consequences for young children raised by opioid and methamphetamine addicted parents is the dramatic impact on brain development. *See* Asher Ornoy et al., *Developmental Outcome of School-Age Children Born to Mothers with Heroin Dependency: Importance of Environmental Factors*, 43 Developmental Med. & Child Neurology 668, 672–73 (2001).

The mother was incarcerated in a jail facility in Winner, South Dakota, at the time of the termination hearing. She had been arrested in South Dakota on multiple felony charges involving possession of controlled substances with intent to deliver, possession of methamphetamines, and other crimes alleged to have occurred in three different counties in South Dakota. Prior to the termination hearing, the mother moved for a continuance due to her imprisonment or, alternatively, requested to participate in the hearing by telephone.

The juvenile court denied the motion for a continuance. It concluded the resulting delay would not be in the best interests of the children. Instead, it granted the mother's alternative request to appear at the hearing by telephone, but only to present her testimony and to be cross-examined. The juvenile court, however, directed that she present her testimony at the close of the State's case-in-chief to allow her counsel to inform her prior to testifying of the nature of the evidence presented by the State in support of the termination.

Counsel throughout the hearing represented the mother. After the State concluded the presentation of its evidence, the mother conferred with her counsel and then presented her testimony. At the conclusion of the telephone call, the attorneys presented their closing arguments. The juvenile court subsequently entered a written order terminating the mother's parental rights.

On appeal, the mother claimed the process provided by the juvenile court for her to participate in the termination hearing deprived her of her rights to confront witnesses, assist in cross-examination of witnesses, and hear the evidence offered by the State. She identified numerous findings of fact made by the juvenile court in the juvenile order that were based on evidence submitted by the State that she

claimed was incorrect and was unable to refute due to the limitations on her ability to participate in the hearing.

The State acknowledged the better practice may have been to allow the mother to participate by telephone in the entire hearing, but argued the procedure followed by the court satisfied the minimum requirements of due process. The court of appeals found the procedure was "good enough" under its precedent, although it too acknowledged the "better practice" would have been to do more to give the mother a greater opportunity to participate in the hearing.[2]

The mother requested, and we granted, further review. She asks that we establish the procedure for juvenile courts in this state to follow in conducting hearings to terminate parental rights of parents who are incarcerated. She requests a new hearing under a procedure that gives her an opportunity to participate in the entire hearing.

**II. Scope of Review.**

Our review of termination of parental rights proceedings is de novo. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). Although we are not bound by the juvenile court's findings of fact, "we do give them weight, especially in assessing the credibility of witnesses." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Constitutional claims, such as the deprivation of due process, are also reviewed de novo. *P.M. v. T.B.*, 907 N.W.2d 522, 530 (Iowa 2018).

---

[2]The court of appeals identified the issue on appeal as whether the juvenile court violated the mother's procedural due process rights by restricting her participation at the hearing. The State also framed the issue in its brief on appeal as a due process claim, and we granted further review under that framework. After we granted further review and asked the State to file a response, the State argued for the first time that the mother failed to preserve error specifically as a due process claim. We decline to address this contention so late in the judicial process. Furthermore, any sound resolution of the issue in this case necessarily requires us to rely on considerations based on due process.

Moreover, our review of a district court's denial of a motion for continuance is for an abuse of discretion. *State v. Clark*, 814 N.W.2d 551, 560 (Iowa 2012). A court abuses its discretion when "the decision is grounded on reasons that are clearly untenable or unreasonable," such as "when it is based on an erroneous application of the law." *In re A.M.*, 856 N.W.2d 365, 370 (Iowa 2014) (quoting *Office of Citizens' Aide/Ombudsman v. Edwards*, 825 N.W.2d 8, 14 (Iowa 2012)).

Most importantly, "our fundamental concern" in review of termination of parental right proceedings "is the child's best interests." *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014).

### III. Analysis.

The cornerstone of the analysis of the issue presented in this case is due process of law. *See* U.S. Const. amend. XIV, § 1; Iowa Const. art. I, § 9. The protections provided people under the constitutional guarantee of due process are fundamental to society. These protections include procedural safeguards for people who face state action that threatens a protected liberty or property interest. *Bowers v. Polk Cty. Bd. of Supervisors*, 638 N.W.2d 682, 690 (Iowa 2002). Once the law finds a protected interest to exist, the question turns to what process or procedure the law must provide the person. *In re C.M.*, 652 N.W.2d 204, 212 (Iowa 2002). Generally, three competing interests have shaped the contours of this protection.

> First, the private interest . . . affected by the [proceeding]; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [third,] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976); *see In re C.M.*, 652 N.W.2d at 212. These factors identify the interests and concerns involved and draw upon evidence and analysis to give a specific meaning to due process.

We have said that parental termination hearings involve state action that threatens to deprive parents of their liberty interests in the care, custody, and control of their children. *In re C.M.*, 652 N.W.2d at 211. Thus, the broad issue we address in this appeal turns on how much process is due to incarcerated parents who face a hearing to terminate their parental rights.

Procedural due process plays a significant role in the overall operation of our justice system. The way a justice system treats people who enter it must be as just and fair as the court decisions made by its judges. This understanding shines greater light on the critical importance of procedural fairness of a court system and the need for courts to ensure fairness in the process of justice itself.

The mother in this case asked for due process in the form of a continuance of the termination hearing or, alternatively, an opportunity to participate in the hearing by telephone. This claim illustrates the challenge in achieving procedural due process. The outcome involves a careful balancing of the personal interest of litigants, the ability of the court system to accommodate and provide safeguards for litigants, and the broad interests of the government to both provide safeguards and protect the interests of all. The requested procedure also applies to a final hearing on the merits of the action. Unlike a hearing on an application for postconviction relief, the parent has not yet had his or her day in court. The hearing involves a final adjudication of the rights at stake.

**A. Continuance of the Hearing.** A continuance of a termination hearing until an incarcerated parent is able to attend may be helpful to the parent, but the delay that accompanies such continuances may be detrimental to the best interests of children. *See In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) (indicating children must not be forced to wait for responsible parenting). The focus of child welfare in this country, and Iowa, is now on permanency, and continuances of court hearings to accommodate parents might offend this goal. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) (explaining the Adoption and Safe Family Act of 1997 refocused the goals of child welfare cases by its increased emphasis on children's health and safety and mandate that children be placed in a permanent home as early as possible). The juvenile court in this case understood this potential harm and sought to strike the balance demanded by the Due Process Clause by allowing for a telephone appearance at the hearing.

The State suggests a continuance is not even a procedural option for a juvenile court in termination hearings when the parent is not incarcerated in the same county as the court. It claims a court may only order a person confined in a penitentiary or jail to appear in a civil case to give testimony in a court in the county where the person is imprisoned. *See* Iowa Code § 622.82 (2017). The State also points out this statutory limitation is the foundation of the rule that has been followed in Iowa, previously articulated by the court of appeals, and applied by the juvenile judge in this case that incarcerated persons only need to receive advance notice of a hearing, be represented by counsel at a hearing, and be given an opportunity to present testimony orally by telephone. *See Webb v. State*, 555 N.W.2d 824, 826 (Iowa 1996) (applying the rule to postconviction-relief proceedings and citing *In re*

*J.S.*, 470 N.W.2d 48, 52 (Iowa Ct. App. 1991), holding the same is true involving the termination of parental rights).

We find it unnecessary to address the State's statutory argument. Section 622.82 generally applies to persons incarcerated in this state. The mother in this case was not confined in Iowa. Furthermore, Iowa Code section 232.112 specifically requires parents be given "an opportunity to be heard" in a termination hearing. Nevertheless, the motion for continuance made by the mother in this case did not ask the juvenile court to order her appearance in court at a future hearing while incarcerated. Additionally, the mother did not ask us to recognize a due process right for incarcerated parents to be physically present at a termination hearing. *See In re Termination of Parental Rights of Heller*, 669 A.2d 25, 32 (Del. 1995) (recognizing no due process right for an incarcerated parent to be present at a hearing to terminate parental rights); *In re J.P.B.,* 509 S.W.3d 84, 97 (Mo. 2017) (recognizing no constitutional right of incarcerated parents to attend a termination hearing); *St. Claire v. St. Claire*, 675 N.W.2d 175, 177–78 (N.D. 2004) (concluding an incarcerated parent has only a limited right to appear in person at a hearing to terminate parental rights). Accordingly, we review the juvenile court's denial of the motion for continuance in this case under an abuse-of-discretion standard and find ample reasons that show the juvenile court properly exercised its discretion to deny the continuance. *See In re Involuntary Termination of Parent–Child Relationship of K.W.*, 12 N.E.3d 241, 244–47 (Ind. 2014) (identifying and applying eleven factors, typically used in consideration of a motion to transport an incarcerated parent, to review the exercise of discretion in denying a motion to continue a termination hearing). The mother made no claim that she would be unable to participate meaningfully in the

termination hearing by telephone, with the physical presence of counsel at the hearing. On the other hand, the delay associated with a continuance of a hearing until the physical appearance of an incarcerated parent can be achieved could very well be contrary to the best interests of children and our nation's policy. Considering all relevant factors, the balance of the competing interests support the mother's alternative request to participate by telephone, not a continuance. The fighting issue turns on whether the limitations imposed by the juvenile court on the mother's participation in the hearing by telephone comply with due process.

**B. Participation in Hearing by Telephone.** Generally, an incarcerated parent who is unable physically to attend a termination hearing must be given the opportunity to participate in the hearing by alternative means. *In re Baby K.*, 722 A.2d 470, 472 (N.H. 1998) (concluding due process does not require an incarcerated parent's physical presence at the termination hearing "provided the parent is otherwise afforded procedural due process at the hearing"); *In re Adoption of J.N.F.*, 887 A.2d 775, 781 (Pa. Super. Ct. 2005) (holding a trial court must give an incarcerated parent the ability to meaningfully participate in a termination proceeding if the parent desires to contest the termination petition). Some courts have concluded that due process is satisfied when an incarcerated parent is afforded the opportunity to participate in the entire termination hearing by telephone from the prison. *Orville v. Div. of Family Servs.*, 759 A.2d 595, 599 (Del. 2000) (holding the family court should have afforded the incarcerated mother an opportunity to participate by phone for the entire hearing and citing its prior decision in *Heller*, 669 A.2d at 32, as concluding the same proposition); *In re Baby K.*, 722 A.2d at 473 (finding the incarcerated

father's inability to hear the proceedings via telephone "increased the risk of an erroneous determination"). These courts stress that meaningful participation in a parental termination case requires actual knowledge of the testimony and documentary evidence offered in support of the petition for termination. *See Orville*, 759 A.2d at 599. Parents often have exclusive and particular knowledge of the evidence offered by the state to support the termination petition and need to hear it to understand the evidence needed to make an effective response. *Id.* at 600. It is a concept fundamental to a system of justice. These observations make the parent's interests in appearing by telephone for the entire hearing compelling. *See Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S. Ct. 1388, 1394–95 (1982) (recognizing procedural protections for parents facing termination of rights to their children are more critical than for parents resisting state intervention into ongoing family matters). Moreover, the full-participation standard has given rise to a further requirement for juvenile courts to implement substitute procedures and accommodations when circumstances surface to impugn the ability of a parent to hear and participate in the entire hearing. *See Orville*, 759 A.2d at 600. The substitute procedures center on a brief continuance of the hearing to provide the parent a transcript or digital reproduction of those portions of the hearing that the parent did not hear over the telephone prior to testifying by telephone. *See id.* (offering a variety of safeguards that can be utilized to protect an incarcerated parent's due process rights). They seek to give a parent the substantial equivalence of full participation. *See In re Termination of Parental Rights to Idella W.*, 708 N.W.2d 698, 702–03 (Wis. Ct. App. 2005) (recognizing alternative proceedings must be "functionally equivalent to personal presence" (emphasis omitted)).

Other jurisdictions, on the other hand, are more deferential to the limitations inherent in the authority of courts to order prisoners in other states to be available to participate in an entire hearing. They permit limited participation by telephone without additional safeguards if justified by other circumstances based on a balancing of the *Mathews* factors. *See In re D.C.S.H.C.*, 733 N.W.2d 902, 910 (N.D. 2007) (recognizing the importance of parent's participation in entire proceeding, but declining to remand in part due to the court's inability to compel the out-of-state correctional facility to allow incarcerated parent to participate in entire hearing); *see also In re Involuntary Termination of Parent–Child Relationship of C.G.*, 954 N.E.2d 910, 921–23 (Ind. 2011) (reviewing the approaches followed by courts in other jurisdictions).

We acknowledge the process due in each case is flexible depending on the particular circumstances. *In re A.M.H.*, 516 N.W.2d 867, 870 (Iowa 1994). We also acknowledge the procedure followed by the juvenile court in this case provided some due process for the incarcerated mother. Yet, the competing interests involved simply do not justify the limitations imposed on full participation.

In termination hearings, the flexibility of due process should only work to identify a substitute procedural safeguard for incarcerated parents who are unable to participate by telephone for the entire hearing. It does not justify a rule that only allows a parent to participate in the hearing to the extent of testifying. We therefore reject a rule that limits the telephone participation of an incarcerated parent in a hearing to terminate parental rights to giving testimony.

Instead, we adopt the standard that juvenile courts in this state must give incarcerated parents the opportunity to participate from the prison facility in the entire termination hearing by telephone or other

similar means of communication that enables the parent to hear the testimony and arguments at the hearing. The interests of the parent, the child, and the state support this opportunity. In particular, it serves the compelling interest of the parent to hear the evidence offered in support of a termination petition and to respond effectively to the evidence. We agree with the observations by other courts that parents normally have unique and exclusive knowledge of evidence concerning the termination. After all, their conduct is at issue. The risk of error is too great if a parent does not have the opportunity to hear this evidence and to formulate a response to it.

The opportunity to participate by telephone means the juvenile court must preside over the proceedings in a manner that will best meet this standard. It will require the type of technology commonly used in courtrooms today, with a dose of cooperation from prison officials. We, of course, recognize that circumstances may arise that will challenge the juvenile court's ability to enable a parent to participate in the entire hearing, such as restrictions imposed by prison officials limiting the ability of the incarcerated parent to be available for the entire hearing. *See Orville*, 759 A.2d at 597 (involving out-of-state prison that would not allow incarcerated parent to participate in entire hearing); *In re D.C.S.H.C.*, 733 N.W.2d at 908 (explaining juvenile court could not compel out-of-state prison to compel incarcerated parent to participate in entire hearing); *In re Baby K.*, 722 A.2d at 472 (remanding due to incarcerated parent's inability to hear proceedings via telephone connection). The problems can be particularly acute when out-of-state correctional officials decline to make a parent available for the entire hearing. The authority of the juvenile court to direct out-of-court officials to comply with the hearing process is limited. *See In re D.C.S.H.C.* 733

N.W.2d at 908. This limitation, however, does not abate the continuing role of due process.

In the event prison officials from other states, or other circumstances, do not permit the standard to be met, the juvenile court shall provide an alternative process that allows the parent to review a transcript of the evidence offered at the hearing. In this instance, the court must direct an expedited transcript of those portions of the hearing that were closed to the parent be prepared and given to the parent to review prior to testifying by telephone, along with all exhibits admitted into evidence. This alternative means of participation not only permits the parent to testify by telephone or teleconference after having an opportunity to review the record, but to recall witnesses who testify for the state for additional cross-examination and to present other testimony and documentary evidence at the hearing. *Orville*, 759 A.2d at 600.

We recognize this requirement will likely add additional expense and require additional time to complete the termination process, but not more than other existing procedural requirements needed to ensure fairness in hearings where so much is at stake. It is in the best interests of children for the court process to proceed without delay, but it is also in the best interests of children that their parents have a full and fair opportunity to resist the termination of parental rights. The potential for error is enhanced if a parent is not informed of the evidence presented in support of the termination. Furthermore, time needed for courts to complete a hearing consistent with the notions of due process is not the type of delay that is contrary to the best interests of children. This same understanding applies to any expenses associated with the process of providing parents with a transcript. Transcripts are commonly prepared and used in our justice system, and using them as an alternative

safeguard in a termination hearing is not an administrative burden for the state. A true and accurate record has always been a fundamental component of justice and can be used in many ways to promote confidence in a justice system. Additionally, time expended to prepare a transcript for an incarcerated parent during a termination hearing will reduce the time needed to file the transcript for the appeal. Furthermore, technology now allows transcripts to be prepared much faster than in the past, and some juvenile courts are now equipped with digital recording. Finally, the expense of producing a transcript or other record can be assessed as court costs.

In the end, the standard now established in this opinion for juvenile courts to follow in termination hearings involving incarcerated parents is compatible with what a justice system should do for all litigants who need a reasonable accommodation. More importantly, the role of the juvenile judge will continue to be the important driver of procedural fairness expected of courts.

Judges who preside over parent termination hearings must first seek to arrange for the incarcerated parent to participate in the entire hearing by telephone, teleconference, or other similar means, and only need to resort to the alternative procedure in response to uncooperative out-of-state prison officials after first seeking their cooperation.[3] Thus, the role of a juvenile judge to seek cooperation in managing the hearing becomes part of due process. Judges are leaders and must at times exercise leadership to help achieve justice. This leadership means juvenile judges may need to confer with prison officials prior to

---

[3]The burden remains with the attorney for incarcerated parents to coordinate their telephonic participation at the hearing. *See* Iowa Ct. R. 61(10). Nevertheless, our judges are facilitators of justice for all who utilize our court system. In that sense, it is important that they aid in ensuring parents are provided the appropriate due process.

termination hearings to explain the importance of the court procedures and the need for their cooperation to help assure procedural justice. The authority of a court does not just come from the issuance of an order. It also can be found by creating an understanding of justice for others to see and respond. Justice, in the end, is not just for courts to give people. It is for all, and for all to give.

Upon review of the current procedure, we conclude juvenile court judges must follow a different procedure moving forward. First, what has been acknowledged as the better practice over the years will now be the standard practice. Juvenile judges must give incarcerated parents the opportunity to participate by telephone in the entire hearing. Second, if the attorney representing the incarcerated parent is unable to obtain the cooperation of prison officials to make the incarcerated parent available for the entire hearing, the juvenile court must communicate with the prison officials to explain the importance of participation by the parent and the benefits of avoiding the alternative procedure. Finally, if the efforts of the juvenile court are unsuccessful in giving the parent an opportunity to participate in the entire hearing, the juvenile judge must follow the alternative procedure that gives the incarcerated parent the opportunity to review the record of the evidence presented by the state at the hearing before testifying. In the end, the new procedure simply means that the juvenile judge or court staff may need to make a phone call or send a communication, a court reporter may need to prepare a transcript, and the termination hearing may need to be bifurcated.

## IV. Conclusion.

We vacate the decision of the court of appeals and reverse the termination order of the juvenile court. We remand the case to the

juvenile court for additional expedited proceedings in accordance with this opinion.

**DECISION OF THE COURT OF APPEALS VACATED; JUVENILE COURT DECISION REVERSED AND REMANDED.**

All justices concur except Christensen, Waterman, and Mansfield, JJ., who concur in part and dissent in part.

**CHRISTENSEN, Justice (concurring in part and dissenting in part).**

I agree with the majority's holding that the juvenile court did not abuse its discretion in denying the mother's motion for continuance. I also agree this court should vacate the decision of the court of appeals, reverse the decision of the juvenile court, and remand the case for an expedited hearing. But, I cannot agree to the majority's onerous mandates for juvenile court judges and their effects on court reporters. As a matter of sound judicial administration, incarcerated parents generally should be permitted to participate by phone in the entire termination hearing as long as it is arranged by the parent's attorney and allowed by prison officials. Contrary to the majority's holding, failure to do so in this case was simply a lack of sound judicial administration, not a matter of constitutional due process. This case is about what is in the best interest of a child and achieving permanency. However, the majority unduly favors incarcerated parents by creating new, unwarranted burdens on the juvenile courts that will impede the paramount goal of protecting the best interests of children who so desperately need a permanent home.

**I. Error Preservation.** First, we should not decide an important constitutional matter on appeal when the mother failed to preserve her due process argument for appeal. By ignoring our error preservation rules, the majority is reversing the juvenile court for failing to credit an argument that the mother never made. While the mother did move to continue and appear by telephone, she did not raise due process arguments in juvenile court or her petition for appeal. The motion argues that "it would be unfair and unjust to hold a hearing regarding the placement" without her presence, but that is the closest the record

comes to any form of due process argument. It is not close enough. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Due process claims obviously implicate constitutional issues, but neither the petition on appeal nor application for further review so much as cites the due process provision of the Iowa Constitution or the United States Constitution. Therefore, I would not leap to either constitution to decide this issue on constitutional grounds.

**II. Procedural Due Process.** Second, the juvenile court did not deprive the mother of her due process rights. The United States Constitution and the Iowa Constitution both provide Iowans with due process protections so that the state shall not "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1; *see* Iowa Const. art. I, § 9. Procedural due process mandates "notice and opportunity to be heard in a proceeding that is 'adequate to safeguard the right for which the constitutional protection is invoked,' " before the government can deprive anyone of a protected interest. *In re C.M.*, 652 N.W.2d 204, 211 (Iowa 2002) (quoting *Bowers v. Polk Cty. Bd. of Supervisors*, 638 N.W.2d 682, 691 (Iowa 2002)).

In the past, we have recognized that termination proceedings "threaten[] to deprive the [parent] of [a] liberty interest in the care, custody, and control of [his or] her child." *Id.* at 211. Given the protected interest implicated in termination proceedings, we balance three competing interests to determine the constitutional requisites of the procedure. *Id.* at 212. These interests are

> (1) the private interest affected by the proceeding; (2) the risk
> of error created by the procedures used, and the ability to
> avoid such error through additional or different procedural

safeguards; and (3) the countervailing governmental interests supporting use of the challenged procedures.

*Id.*

We examined these competing interests involved in termination proceedings in *In re C.M.*, in which we held that a parent's due process rights were not violated when the parent was limited to raising her claims of error on appeal in a petition rather than in a brief. *Id.* at 207, 211–12. In doing so, we noted the importance of the presence of counsel as a safeguard for the parent's due process rights. *Id.* at 212. Regarding the first factor, we concluded, "A parent has an interest in the custody of his or her child." *Id.* Regarding the third factor, we explained that it is in the state's interest to finalize the termination expediently "so as to meet the child's emotional and psychological need for a permanent home, as well as to control the financial drain on the State caused by needlessly protracted proceedings." *Id.* We also found the parent has an interest "in a speedy conclusion because of the potential of regaining custody." *Id.* Despite these competing interests, we cannot forget the paramount interest in termination proceedings is always the best interests of the child. *See, e.g.*, *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014); *see also* Iowa Code § 232.1 (2017) ("This chapter shall be liberally construed to the end that each child under the jurisdiction of the court shall receive, preferably in the child's own home, the care, guidance and control that will best serve the child's welfare and the best interest of the state.").

This case hinges on the second factor, which is "the risk of error created by the procedures used, and the ability to avoid such error through additional or different procedural safeguards." *In re C.M.*, 652 N.W.2d at 212. We have previously held that "[b]iological parents have a due process right to notice and a hearing before termination of their

parental rights may occur*.*" *In re J.C.*, 857 N.W.2d at 506. This requirement "serves the best interests of the child by ensuring that subsequent placements are not later upset, to the detriment of the child." *Id.* at 507. Nevertheless, a parent's right to notice and hearing does not mean the parent has a due process right to attend the termination hearing. *Cf. Webb v. State*, 555 N.W.2d 824, 826 (Iowa 1996) (per curiam) (citing *In re J.S.*, 470 N.W.2d 48, 52 (Iowa Ct. App. 1991)).

A termination of parental rights (TPR) proceeding is a civil matter. *In re D.J.R.*, 454 N.W.2d 838, 846 (Iowa 1990). In *In re J.S.*, a father argued the juvenile court violated his due process rights when it denied his request to be transported from prison to attend the termination hearing in person, claiming he had the "right to know the charges, allegations, and evidence presented against him, as well as a right to have the State present its case first." 470 N.W.2d at 51. The parent's counsel attended the hearing, and the parent's testimony was presented by deposition. *Id.*

The court of appeals concluded in a published opinion that a parent is not "deprived of fundamental fairness" so long as the "parent receives notice of the petition and hearing, is represented by counsel, counsel is present at the termination hearing, and the parent has an opportunity to present testimony by deposition." *Id.* at 52. In reaching this conclusion, the court of appeals noted the parent "mistakenly assert[ed] [S]ixth [A]mendment rights granted to a criminal defendant in a criminal case. The termination of parental rights is a civil case." *Id.* at 51–52.

In *Webb*, we cited *In re J.S.* to support our holding that a defendant's due process rights "did not include attendance at the [postconviction-relief] hearing." 555 N.W.2d 824, 826 (Iowa 1996). In

*Webb*, the defendant seeking postconviction relief received notice of the hearing and telephone conference, was represented at the hearing by counsel, and was provided the opportunity to present his testimony by telephone. *Id.* at 826. We determined these safeguards adequately "accorded the fundamental fairness due to him." *Id.* (citing *In re J.S.*, 470 N.W.2d at 52).

In this matter, similar to the father in *In re J.S.* and the defendant in *Webb*, the juvenile court provided the mother with procedural safeguards necessary to afford her fundamental fairness to protect against the risk of erroneous deprivation of her parental rights. Although the mother did not participate telephonically for the entirety of the hearing, her attorney was present on her behalf for the entirety. Moreover, much of the evidence presented against the mother was well documented due to her criminal charges and record, as well as her past interactions with the department of human services due to the children's child-in-need-of-assistance (CINA) adjudications. At the termination hearing, the State asked the juvenile court to take judicial notice of many of the same exhibits used in the CINA adjudications. Thus, not only did the mother have access to the CINA transcripts, but she also had access to the CINA exhibits, which were the same exhibits used in her termination hearing. The mother was aware of the claims being made against her, and many of the facts she disputes on appeal boil down to credibility determinations the juvenile court was within its discretion to make.

At the time the juvenile court issued its TPR order in May, the mother in this case was facing several criminal charges in the State of South Dakota, including (1) possession of a controlled substance with intent to deliver (class 3 felony), (2) possession of a controlled substance

(class 5 felony), (3) three counts of possession of drug paraphernalia (class 2 misdemeanor), (4) possession with intent to deliver a controlled substance—methamphetamine (class 4 felony), (5) two counts of possession of a controlled substance—methamphetamine (class 5 felony), (6) possession of a controlled substance—clonazepam/klonopin (class 6 felony), (7) distribution of a controlled substance—methamphetamine (class 4 felony), (8) unauthorized ingestion of a controlled substance—methamphetamine (class 5 felony), (9) ingesting marijuana (class 1 misdemeanor), and (10) possession of two ounces or less of marijuana (class 1 misdemeanor). She also pled guilty to conspiracy to manufacture in the State of Iowa, a class C felony, and served time in prison from 2008 to 2010.

The mother's failure to maintain a meaningful and significant relationship with the children is a further indicator of her inability to prioritize what is in their best interest. She had not had any authorized contact with her children in the five months preceding her termination and stopped visiting the children on her own prior to her arrest, though she did text M.D. from jail. M.D. subsequently attempted suicide and explained that her mother's text messages contributed to her suicide attempt.

The evidence shows the other children have also sustained significant emotional harm related to contact with their mother, as K.T., G.A., and E.A. have all participated in therapy to address behavioral concerns. K.T. has reported struggles with her emotions regarding her mother, and G.A.'s negative behaviors increased when her mother stopped visiting in January 2018. The only child who was not undergoing therapy at the time of the TPR hearing was S.A., who was less than two years old at the time.

The mother has failed to address her substance abuse issues and other mental health issues by refusing services offered to her to treat these issues. Though the mother claimed to have been sober for sixty days at her TPR hearing, she was also incarcerated during this time. There is a significant difference between remaining sober in the structured, monitored prison setting and maintaining sobriety outside of prison.

She previously had her parental rights terminated to two other children due in large part to her substance abuse. The evidence also shows the mother engaged in drug use and criminal activity before the children in this case were removed from her care, and she exposed at least some of these children to the various men she was using drugs with before the children's removal from her care. Nevertheless, the mother continues to deny her role in the abuse, claiming the children's emotional trauma is the result of her inability to be with them. *See In re L.H.*, 904 N.W.2d 145, 153 (Iowa 2017) ("An important aspect of a parent's care for his or her child is to address his or her role in the abuse of the child.").

Moreover, the mother continued to maintain unhealthy relationships with a number of men involved with drugs in the past while the CINA adjudication was pending in this case. Since 2015, she has relapsed with five different men. She began a relationship with one of these men in December 2017 and married him the month before the TPR hearing.

Notably, once the children were removed from the mother's care, all of them were placed with their respective biological fathers in stable homes. The fathers continue to participate in services to assist their children in receiving the treatment they need, and they have been

working together to ensure the children spend quality time together as siblings. The juvenile court correctly found that these placements were in the best interests of the children and that clear and convincing evidence supported terminating the mother's rights. *See In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) ("We will uphold an order terminating parental rights if there is clear and convincing evidence of grounds for termination under Iowa Code section 232.116. Evidence is 'clear and convincing' when there are no 'serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence.' " (quoting *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000)).

The majority's holding that the juvenile court violated the mother's due process rights because due process "give[s] incarcerated parents the opportunity to participate from the prison facility in the entire [termination] hearing" goes too far and ignores settled law that has been followed for decades in termination proceedings. The majority's decision that mandatory participation in the entire hearing provides the parent with the opportunity to "recall witnesses who testifi[ed] for the state for additional cross-examination and to present other testimony and documentary evidence at the hearing," conflates the rights granted to a criminal defendant with those afforded to a parent in a civil termination hearing. Not only does this threaten the validity of *Webb*, but the majority's decision to provide parents with heightened due process rights in civil termination hearings also calls into question the validity of our juvenile rules of procedure.

Generally, the juvenile court operates under less strict procedural rules than other courts. "The tasks of the juvenile court and the procedures developed are somewhat akin to the tasks and procedures developed in administrative law." *In re Delaney*, 185 N.W.2d 726, 737

(Iowa 1971) (Becker, J., concurring specially). For example, rule 8.19 of our juvenile rules allows the use of hearsay evidence "in whole or in part" in child-in-need-of-assistance and termination proceedings as long as "there is a substantial basis for believing the source of the hearsay to be credible and for believing the information furnished." Iowa Ct. R. 8.19; *see also* Iowa Code § 232.96(4)–(6). However, the majority's decision to transform the termination hearing procedures from civil to quasi-criminal and prioritize the rights of a parent over the best interest of a child serves only to thwart this court's commitment to putting the welfare of Iowa's children first.

A number of courts provide juvenile court judges with discretion on this issue, "while finding that representation by counsel and the opportunity to appear via deposition are the two key components required in a due process analysis of a parent who is not in attendance at a proceeding" to terminate parental rights. *In re Involuntary Termination of Parent–Child Relationship of C.G.*, 954 N.E.2d 910, 921–22 (Ind. 2011) (surveying the procedural due process requirements of other states with regard to a parent's presence at a termination hearing). Other states that have departed from this procedure to enhance the rights of parents have at least provided guidance to aid juvenile courts in their determination of whether a parent's attendance is allowed at the entire termination hearing. For example, the Supreme Court of Nebraska provides the juvenile court with discretion on this issue but requires the juvenile court to make its determination after considering the following factors:

> the delay resulting from prospective parental attendance, the need for disposition of the proceeding within the immediate future, the elapsed time during which the proceeding has been pending before the juvenile court, the expense to the

> State if the State will be required to provide transportation for the parent, the inconvenience or detriment to parties or witnesses, the potential danger or security risk which may occur as a result of the parent's release from custody or confinement to attend the hearing, the reasonable availability of the parent's testimony through a means other than parental attendance at the hearing, and the best interests of the parent's child or children in reference to the parent's prospective physical attendance at the termination hearing.

*In re L.V.*, 482 N.W.2d 250, 258–59 (Neb. 1992). Not only is Nebraska in the same federal circuit as us, but it also has similar statutes governing children in need of assistance and the termination of parental rights. *Compare* Neb. Rev. Stat. Ann. § 43-283 (West, Westlaw through 2d Reg. Sess. of the 105th Leg.(2018)), *with* Iowa Code § 600A.7.

The majority points to a case in Delaware as an example in support of its position that incarcerated parents should be afforded the opportunity to participate in the entire termination hearing by telephone from prison. *See, e.g.*, *Orville v. Div. of Family Servs.*, 759 A.2d 595, 599 (Del. 2000). However, the majority should not rely on the Delaware court's interpretation of Delaware's statutes when they are fundamentally different from Iowa's statutes on the termination of parental rights. For example, when a child in Delaware has attained the age of one year, notice of termination must be given to every alleged father, whether or not he has registered with the Office of Vital Statistics. Del. Code Ann. tit. 13, § 8-405 (West, Westlaw through 81 Laws 2018, chs. 200–453). On the other hand, when a child has not attained the age of one year, the Delaware Code allows for the termination of parental rights "of a man who may be the father of a child" without notice if "[t]he man did not register timely with the Office of Vital Statistics; and [t]he man is not exempt from registration under § 8-402." Del. Code Ann. tit.13, § 8-404.

In contrast, Iowa does not treat the father of a six-month-old child any differently than the father of a six-year-old child. They are going to both receive notice of termination proceedings. Perhaps *Orville* requires telephonic participation for the entire termination hearing to make up for other procedural shortcomings such as notice. Overall, whatever the reason, Iowa does not need to have such a hard-and-fast rule. We have procedural safeguards in our CINA and TPR statutes to adequately accord fundamental fairness to parents. *See, e.g.*, Iowa Code § 232.88 (requiring reasonable notice be provided to parents, guardians, and legal custodians when a CINA petition has been filed); *id.* § 232.89 (providing the parent, guardian, or custodian identified in the CINA petition with a right to counsel for all CINA hearings and proceedings); *id.* § 232.113 (providing the parent identified in a TPR petition with the right to counsel for all TPR hearings and proceedings); *id.* § 232.112(1) (entitling parents, guardians, and legal custodians to receive notice of TPR proceedings).

Notably, Iowa law authorizes the juvenile court to temporarily excuse the presence of a parent "when the court deems it in the best interests of the child." *Id.* § 232.38(2). This confirms that the best interests of the child ought to prevail in the event of any conflict with a parent's asserted right of attendance. Does the majority believe this statute is unconstitutional?

Finally, the majority's holding is detached from reality, as it creates substantial practical problems and provides no guidance to resolve them. For example, termination hearings often times take several days to complete and involve numerous witnesses and voluminous exhibits to review. The Iowa Department of Corrections (DOC) is a state agency that operates within the executive branch of the government. Yet, the majority expects juvenile court judges to exert authority over the DOC's

prison facilities by directing the facilities to divert their resources to ensure an incarcerated parent participates in the entire hearing by telephone or a similar means of communication. The problems merely increase if the parent is in federal prison. Despite the majority's emphasis on the ability of judicial leadership to persuade out-of-state correctional officials to make the parent available for the entire hearing, even the best leadership from juvenile judges may not be enough to ensure this cooperation.

In those situations when arrangements cannot be made for an incarcerated parent to participate in the hearing, the majority mandates juvenile courts to order an expedited transcript of those portions of the hearing that the parent could not attend prior to testifying by telephone, along with all exhibits in evidence. The cost of a several-day transcript is certainly significant. Requiring court reporters to expedite a several-day trial even more than what is expected in an already expedited proceeding is unrealistic.[4]

Significantly, attorneys for parents routinely have to prepare their petitions on appeal without the benefit of a transcript. We have approved that procedure recognizing the importance of the expedited deadlines for processing juvenile cases. *See In re L.M.*, 654 N.W.2d 502, 506 (Iowa 2002). It is not realistic to put chapter 232 procedures on hold while transcripts are prepared.

The majority seems to turn a blind eye to the overarching directive of Iowa Code chapter 232 to achieve permanency for the child in a timely

---

[4]Iowa is already experiencing a significant shortage of official court reporters. *See, e.g.*, Iowa Judicial Branch FY 19 Budget Request, https://www.iowa courts.gov/static/media/cms/2019_budgetrevenues_76551E67392EF.pdf ("There are 6 court reporter positions that have been vacant for over one year and 12 total current court reporter vacancies.").

fashion and to always place the child's best interest first. The majority must be reminded that this is a *child welfare* proceeding—the termination of a parent's rights happens to be the vehicle by which a child's permanency is achieved when reunification has not been successful. An incarcerated parent's procedural due process rights cannot hinder the timely permanency for a child, and they cannot trump what is in the best interest of a child.

The facts in termination proceedings change frequently. This is especially the case when the juvenile court is dealing with parents who have a severe substance-related disorder and frequently participate in drug testing throughout the course of their termination proceedings. Even a delay of a few weeks could require the state to come back after it presented its case before the delay and present more evidence. This risks getting into a timely back-and-forth presentation of evidence between the parties that only delays the proceedings to the detriment of the children involved.[5]

In any event, if the majority is going to require an incarcerated parent's telephonic attendance through the entire termination hearing, the burden should be on the parent's attorney—not the presiding judge— to see that the parent's right to attend the hearing is being fulfilled. This aligns with our court-approved standards of practice for attorneys representing parents in juvenile court. Specifically, our standards include the following: "Take reasonable steps to communicate with

---

[5]It also represents a step backward from the vision and principles adopted by the Child Welfare Advisory Committee and Children's Justice State Council, which emphasize the urgency required to provide children with permanency. *See* Children's Justice State Council & Iowa Dep't of Human Servs., Child Welfare Advisory Comm., *Iowa's Blueprint for Forever Families* 1 (2011), https://idph.iowa.gov/Portals/1/Files/Substance Abuse/forever_families.pdf ("Permanence is treated with a sense of urgency as if the child were our own or a child of a family member.").

incarcerated clients and to locate clients who become absent. Develop representation strategies. Establish a plan for the client's participation in case-related events." Iowa Ct. R. 61(10). These standards also acknowledge the issues an incarcerated parent's participation raises and explains, "[T]he attorney should make arrangements with the incarcerated client's prison counselor to have the parent appear by telephone" if the parent wishes to participate in the hearing. *Id.* r. 61(10) cmt. [5].

If the prison facility is unwilling to make accommodations for the client to participate telephonically, or if the client is ineligible for telephonic participation because of behavior infractions while incarcerated, then the attorney should make a record of such barriers so that the juvenile court has an opportunity to address them accordingly. Nevertheless, it is unrealistic and improper to expect a juvenile court judge to use his or her judicial authority to advocate for arrangements to be made for an incarcerated parent to participate in the entire telephone hearing by telephone. It is the attorney's responsibility—not the court's—to make arrangements for meaningful participation in court hearings.

Further, the court's decision is certainly creating a slippery slope. It provides incarcerated parents with greater due process rights than nonincarcerated parents. While the majority expects our juvenile courts to make special arrangements and exceptions to accommodate the needs of incarcerated parents so they can be telephonically present for the entire termination hearing, it ignores the needs of nonincarcerated parents. What happens when a nonincarcerated father is unable to attend the termination hearing because his employer will not provide him

with time off work?[6] Is the juvenile court judge now expected to contact the father's employer and throw his or her weight around in an effort to excuse the parent's absence from work to attend the termination hearing? Similarly, what happens when the case involves a parent who is incarcerated and another parent who is not incarcerated and the juvenile court cannot accommodate both the prison facility's schedule and that of the nonincarcerated parent?

Will this case provide legal authority for an incarcerated parent to demand the same services by a district court judge and court reporter in a dissolution, child custody, or paternity action?[7] If the majority is saying that an incarcerated parent in a civil matter is entitled to a judge becoming actively involved in making telephonic arrangements or, in the alternative, ordering an expedited transcript for the entire hearing, then it is not a stretch to answer that question with a yes.

Overall, I agree that the preferable practice in termination proceedings is to allow the parent to participate telephonically for the entire termination proceeding if allowed by prison officials. Absent

---

[6]In Iowa, an employee who appears as a witness in obedience to a subpoena "in any public or private litigation *in which the employee is not a party to the proceedings*" is "entitled to time off during regularly scheduled work hours with regular compensation, provided the employee gives to the appointing authority any payments received for court appearance or jury service, other than reimbursement for necessary travel or personal expenses." Iowa Admin. Code r. 11—63.12 (emphasis added). However, this rule does not require employers to provide employees with time off and compensation to appear in obedience to a subpoena in a civil proceeding in which the employee is a party to the proceedings. Thus, even the power of a subpoena is not enough to prevent a nonincarcerated parent from being penalized at work for time off resulting from the parent's obedience to a subpoena to attend a TPR hearing.

[7]*Cf. Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 2060 (2000) ("[We have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." (Citations omitted.)).

juvenile court findings to support its decision not to allow the parent to participate telephonically for the entire termination hearing—findings that do not exist in this case—the juvenile court should have allowed the mother in this case to participate telephonically for the entire termination as a matter of sound judicial administration. My agreement to remand notwithstanding, the majority's decision to remand this case to the juvenile court should have stemmed from our supervisory authority rather than a constitutional mandate.

This court has inherent supervisory authority to direct the procedures to be followed in Iowa courts, and "our cases have consistently recognized the inherent common-law power of the courts to adopt rules for the management of cases on their dockets in the absence of statute." *Iowa Civil Liberties Union v. Critelli*, 244 N.W.2d 564, 568–69 (Iowa 1976); *see also* Iowa Const. art. V, § 4 (stating that the supreme court "shall exercise a supervisory and administrative control over all inferior judicial tribunals throughout the state"). This allows us to order what is best without constitutionalizing the matter. For example, we have used our supervisory authority to adopt the Pew Commission report that discussed "Fostering Judicial Leadership" and recommended "that courts use best practice approaches" to better "the lives of children in foster care and their families." Pew Comm'n, *Progress on Court Reforms: Implementation of Recommendations from the Pew Commission on Children in Foster Care* 4, 10 (2009), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/phg/content_level_pages/reports/kawcourtsassessmentoctober2009pdf.pdf; *see* Iowa Supreme Ct. Resolution, *In Support of the Recommendations of the Pew Commission on Children in Foster Care* (Sept. 10, 2007). We have also regularly exercised our inherent

authority to allow delayed appeals in criminal cases where the defendant can document that he or she attempted to initiate an appeal before the deadline, without ever finding that a due process violation actually occurred. This is done "to prevent unnecessary challenges," and on the theory that a valid due process argument "might" be advanced. *See Swanson v. State*, 406 N.W.2d 792, 793 (Iowa 1987). We have also "exercised our supervisory authority over the rules of procedure and evidence to prohibit the use of unstipulated polygraph examinations in Iowa courts," although this holding "was not based on due process grounds." *See Dykstra v. Iowa Dist. Ct.*, 783 N.W.2d 473, 485 (Iowa 2010).

Instead of following settled law or using our supervisory authority to provide procedural direction, the majority throws a stick of dynamite into the juvenile court system by adopting a hard and fast approach holding incarcerated parents are entitled to participate telephonically for the entire termination hearing or, in the alternative, delaying the child's permanency by stopping the trial so that expedited full transcripts can be prepared. The majority is altering the constitutional landscape in our state based on an unpreserved constitutional claim without providing a cogent analysis of controlling constitutional precedent. "No particular procedure violates [due process] merely because another method may seem fairer or wiser." *In re C.M.*, 652 N.W.2d at 212 (alteration in original) (quoting *Bowers*, 638 N.W.2d at 691). Yet, this appears to be the basis for the majority's holding today. For these reasons, I concur in part and dissent in part.

Waterman and Mansfield, JJ., join this concurrence in part and dissent in part.